[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 11, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-13214

_____

D. C. Docket No. 00-02820-CV-JEC-1

DEBORAH SCHWIER,
THEODORE SCHWIER, et al.,

                                        Plaintiffs-Appellants,

versus

CATHY COX, in her official capacity as
Secretary of State of Georgia,

                                        Defendant-Appellee,

UNITED STATES OF AMERICA,

                                        Intervenor.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(August 11, 2003)**

Before DUBINA and BLACK, Circuit Judges, and RYSKAMP*, District Judge.

DUBINA, Circuit Judge:

Deborah Schwier, Theodore Schwier, and Michael Craig (collectively, "Appellants") filed suit in federal district court against Cathy Cox ("Cox"), in her official capacity as Secretary of the State of Georgia, seeking declaratory and injunctive relief under 42 U.S.C. § 1983. The Appellants claimed that Georgia's voter registration procedure and Voter Registration Form violated section 7 of the Privacy Act of 1974, Pub. L. 93-579, 88 Stat. 1896, 2194, 5 U.S.C. 552a (note), and section 1971 of the Voting Rights Act of 1870, 42 U.S.C. § 1971(a)(2)(B). The district court found that Appellants could not bring a private right of action under § 1983 for violations of section 7 of the Privacy Act or section 1971 of the Voting Rights Act. For the reasons that follow, we reverse.

## I.  BACKGROUND

Prior to the general election of November, 2000, Deborah and Theodore Schwier ("the Schwiers") attempted to register to vote in Walton County, Georgia. The Schwiers submitted their registration applications without supplying their social security numbers ("ssns"). Subsequently, Walton County officials notified

_____

*Honorable Kenneth L. Ryskamp, United States District Judge for the Southern District of Florida, sitting by designation.

the Schwiers that, unless they supplied officials with their ssns, their voter registrations would be rejected. Michael Craig ("Craig") was unable to vote in Gwinnett County, Georgia because he also refused to supply officials with his ssn. The Schwiers[1] sought and won a preliminary injunction allowing them to vote in the election without providing their ssns in the customary manner.[2] Discovery focused primarily on how Georgia implemented its voter registration statute, O.C.G.A. § 21-2-219.

After discovery, Appellants and Cox filed cross motions for summary judgment. The district court granted Cox's motion for summary judgment on both the Privacy Act and Voting Rights Act claims. Appellants then perfected this appeal.

Appellants claim that Georgia's requirement that they provide their ssns in order to vote and Georgia's Voter Registration Form ("the Form") violate the Privacy Act. Appellants argue that section 7 of the Privacy Act contains no

---

[1]Craig joined the suit later.

[2]The injunction required the Schwiers to file their ssns under seal with the court and also with election officials, who would hold the numbers without entering them into the system. If the Schwiers prevailed on the merits, the election officials would be required to destroy their record of the Schwiers' ssns, but if Cox prevailed, the election officials would be allowed to enter the Schwiers' ssns into the system.

3

remedial scheme and that Appellants may sue Cox for violations of section 7 via § 1983.

Cox argues that the Appellants do not have a private right of action under the Privacy Act. Alternatively, Cox argues that Georgia's voting statute is protected from the prohibitions of the Privacy Act by the Act's "grandfather" provision. Cox further argues that if Appellants may sue state officials for violations of the Privacy Act via § 1983, then passage of the Privacy Act exceeded Congress's authority, and the Privacy Act is unconstitutional.

Because Cox argues that if section 7 of the Privacy Act is enforceable via a private right of action brought under § 1983, then section 7 of the Privacy Act is unconstitutional, the United States ("the Government") intervened as a matter of right pursuant to 28 U.S.C. § 2403(a) and Rule 44 of the Federal Rules of Appellate Procedure. The Government argues that the Privacy Act may be enforced under § 1983 and that Congress did not exceed its authority in passing the Privacy Act.

Appellants also contend that Georgia's requirement that voters supply their ssns in order to vote violates 42 U.S.C. § 1971(a)(2)(B) of the Voting Rights Act, which prohibits states from disqualifying potential voters based on their failure to provide information not relevant to determining their eligibility to vote.

4

Appellants argue that since its enactment in 1871, § 1983 has been available to private citizens to enforce the Voting Rights Act. They contend that when Congress gave the Attorney General the authority to enforce the Voting Rights Act through the enactment of the Civil Rights Act of 1957, Congress *added* a means of enforcing the Voting Rights Act but did not take away the previously existing remedy of private suits via § 1983.

Cox argues that section 1971 of the Voting Rights Act may be enforced only by the Attorney General. In the alternative, Cox argues that, even if § 1971 may be enforced by a private right of action under § 1983, Appellants' claim is moot because Georgia has modified its Voter Registration Form.

## II. ISSUES

1. Whether the district court erred in holding that section 7 of the Privacy Act does not allow for enforcement by a private right of action against state agencies by a suit under § 1983.

2. If the Privacy Act allows for a private right of action, whether Congress exceeded its authority in enacting the Privacy Act, rendering the Privacy Act unconstitutional.

3. Whether Georgia qualifies for the "grandfather" exception of section 7(a)(2)(B) of the Privacy Act.

4. Whether Georgia's Voter Registration Form complies with the notice requirements of section 7(b) of the Privacy Act.

5. Whether the district court erred in holding that section 1971 of the Voting Rights Act may not be enforced by a private right of action under § 1983.

6. Whether the disclosure of a person's ssn is "material" in determining whether he or she is qualified to vote under Georgia law for purposes of section 1971 of the Voting Rights Act.

## III.  STANDARD OF REVIEW

This court reviews "the district court's grant of summary judgment *de novo.* Summary judgment is appropriate where there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1581 (11th Cir. 1995) (internal quotations and citation omitted).

## IV. DISCUSSION

A.  Whether the district court erred in holding that section 7 of the Privacy Act  does not allow for enforcement by a private right of action against state agencies by a suit under § 1983.

The Privacy Act of 1974 contains only two substantive sections, section 3 and section 7.  *See* 88 Stat. at 2177-94.  Section 3 of the Privacy Act *applies only*

6

*to federal agencies* and, among other things, delineates an individual's right to records of federal agencies and right to be protected from disclosure of records by federal agencies. Section 3 contains a comprehensive remedial scheme which includes the right to bring a civil action against a federal agency; however, the remedial scheme of section 3 states that it applies *only* to section 3.

Section 7 of the Privacy Act bars federal, *state,* or local agencies from denying "any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number" to the agency.[3] Section 7 of the Privacy Act does not contain its own remedial scheme

---

[3]The entire text of section 7 of the Privacy Act states:

(a)(1) It shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number.

(2) The provisions of paragraph (1) of this subsection shall not apply with respect to-

(A) any disclosure which is required by Federal statute, or
(B) the disclosure of a social security number to any Federal, State, or local agency maintaining a system of records in existence and operating before January 1, 1975, if such disclosure was required under statute or regulation adopted prior to such date to verify the identity of an individual.

(b) Any Federal, State, or local government agency which requests an individual to disclose his social security account number shall inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it.

88 Stat. at 2194.

and is explicitly excluded from the remedial scheme of section 3; thus, section 7 has *no* remedial scheme.

1. <u>The district court's finding that section 7 of the Privacy Act is a "dead letter</u>."

Within the Privacy Act itself, Congress stated that section 3 was an amendment to Title 5, which governs federal administrative agencies. *See* 88 Stat. at 2178. Thus, section 3 added a new section to Title V and was codified as 5 U.S.C. § 552a. *Id.* at 2177. Because Congress made no such statement about section 7 of the Privacy Act, the revisor of the U.S. Code placed section 7 in an "Historical and Statutory" note following 5 U.S.C. § 552a. *See* 5 U.S.C. § 552a (note). The district court mistakenly placed great weight on this fact. The district court noted that, although section 7 was part of the Privacy Act that "was passed into law as Public Law 93-579," the fact that section 7 "was never codified, and appears only in the 'Historical and Statutory Notes' section of the United States Code," made section 7 a mere "historical footnote to the Privacy Act of 1974 [which] Congress has never reflected any intention of [codifying]." The district court apparently believed that public laws have less "weight" as laws than laws which have been codified. The reverse is true: "the Code cannot prevail over the Statutes at Large when the two are inconsistent." *United States v. Welden,* 377

8

U.S. 95, 98 n.4, 84 S. Ct. 1082, 1085 n.4, 12 L. Ed. 2d 152 (1964) (internal quotations omitted).

The district court also stated that section 7 was deleted from the Privacy Act by the Senate Government Operations Committee "before the law was codified into the official code." The district court quotes Senate Report 1183, but the quote demonstrates that the provision that was deleted from the Act pertained only to a business entity's refusal to enter into a "business transaction or commercial relationship with an individual because of [his] refusal to disclose or furnish [his social security] number." S. REP. NO. 93-1183 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6916, 6943. Thus, the court's conclusion that section 7 of the Privacy Act had been deleted was error. The best proof of this is section 7's presence in the Statutes at Large. *See* 88 Stat. at 2194; *see also Welden,* 377 U.S. at 98 n.4, 84 S. Ct. at 1085 n.4. We therefore conclude that the district court erred in finding that section 7 of the Privacy Act was "a dead letter."

2. The district court's finding that the remedial scheme of section 3 forecloses a private action for violations of section 7.

In finding that section 7 does not provide for a private right of action, the district court relied on the Ninth Circuit's holding in *Dittman v. California*, 191 F.3d 1020 (9th Cir. 1999), that "'[t]he civil remedy provisions of *the statute* do not

9

apply against private individuals, *state agencies*, private entities, or state and local officials.'" 191 F.3d at 1026 (quoting *Unt v. Aerospace Corp.,* 765 F.2d 1440, 1447 (9th Cir. 1985) (first emphasis added)).

In *Dittman*, the Ninth Circuit relied on two cases which involved only section 3 of the Privacy Act. Thus, when the Ninth Circuit quoted *Unt v. Aerospace Corp.* above, the phrase, "the statute," referred to section 3 of the Privacy Act, *not* section 7. *Unt's* holding had no relevance to the facts of *Dittman* or to the present case because in *Unt,* the plaintiff was trying to sue a non-government entity for violations of section 3 of the Privacy Act, which pertains only to federal agencies. *Unt,* 765 F.2d at 1447.

In addition, *Dittman* relied on the Seventh Circuit's holding in *Polchowski v. Gorris*, 714 F.2d 749 (7th Cir. 1983). *Polchowski* also had no relevance to the facts of *Dittman* because, again, *Polchowski* involved enforcement of section 3 of the Privacy Act, rather than section 7. In *Polchowski*, the plaintiff sought to sue a state agency under §1983 for releasing criminal information about him. 714 F.2d at 750. The release of the information would have violated section 3 of the Privacy Act, but section 3 applies only to federal agencies. Thus, the court reasoned, "Congress, by limiting the scope [of section 3 to federal agencies] has provided unequivocal and persuasive evidence that it intended to foreclose private

10

enforcement of [section 3] against state or local officials who make unwarranted disclosures of statistical information." *Id*. at 752 (internal quotations omitted). In other words, the rights created by section 3 of the Privacy Act do not restrict the activities of *state* agencies.

In *St. Michael's Convalescent Hospital. v. California,* 643 F.2d 1369, 1373 (9th Cir. 1981), on which *Dittman* also relied, the plaintiffs sought to sue a state agency under section 3 of the Privacy Act. As in *Polchowski*, the plaintiffs sought to sue a *state* agency for violating a section of the Privacy Act which applies only to *federal* agencies. Thus, the Ninth Circuit dismissed plaintiffs' claims. *St. Michael's*, 643 F.2d at 1372.

In summary, *Unt, Polchowski,* and *St. Michael's*, all relied upon by the Ninth Circuit in *Dittman*, were distinguishable from *Dittman* and did not support the Ninth Circuit's holding in that case. *Dittman* failed to recognize that the remedial scheme of section 3 applies only to section 3 and has no bearing on section 7. Thus, the remedial scheme of section 3 provides no basis for concluding that Congress intended to preclude private remedies under § 1983 for violations of section 7. Therefore, we conclude that the district court erred in finding that the remedial scheme of section 3 of the Privacy Act precluded a private right of action via § 1983 for violations of section 7 of the Privacy Act.

11

3. The district court's finding that the Tax Reform Act of 1976 limited the scope of the Privacy Act.

The district court also found that the Tax Reform Act of 1976, which amended the Social Security Act, authorized the states to use ssns for voting. The court's finding was due in large part to its reliance on *Stoianoff v. Commissioner of Motor Vehicles*, 107 F. Supp. 2d 439, 442 (S.D.N.Y. 2000), *aff'd*, 12 Fed. Appx. 33 (2nd Cir. 2001). However, *Stoianoff* and the district court mistakenly relied on Committee language which was much broader than the very narrow language of the final version of the Tax Reform Act passed into law. *See Stoianoff,* 107 F. Supp. at 442. The final version authorizes States to use ssns only "in the administration of any tax, general public assistance, driver's license, or motor vehicle registration." 42 U.S.C. § 405(c)(2)(C)(i) (2003). Thus, the district court erred in concluding that the scope of the Privacy Act had been limited by the Tax Reform Act.

4. The Privacy Act and §1983.

In *Gonzaga University v. Doe,* 536 U.S. 273, 283-84, 122 S. Ct. 2268, 2276, 153 L. Ed. 2d 309 (2002), the Supreme Court noted that the inquiry into whether a statute contains an implied right of action and the inquiry into whether the statute creates rights enforceable under § 1983 "overlap" in that both inquiries must begin

12

with the question of whether "Congress *intended to create a federal right*." 536 U.S. at 283, 122 S. Ct. at 2275. Here, we ask only whether the Privacy Act creates rights enforceable under § 1983 because this is the issue Appellants raise on appeal.

Section 1983 provides a private right of action whenever an individual has been deprived of any constitutional or statutory federal right under color of state law. *See* 42 U.S.C. § 1983; *see also Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S. Ct. 2502, 2504, 65 L. Ed. 2d 555 (1980). In *Blessing v. Freestone*, 520 U.S. 329, 117 S. Ct. 1353, 137 L. Ed. 2d 569 (1997), the Supreme Court noted that they had "traditionally looked at three factors when determining whether a particular statutory provision gives rise to a federal right":

First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

520 U.S. at 340-41, 117 S. Ct. at 1359 (internal citations and quotations omitted).[4]

However, in *Gonzaga*, the Court pointed out that some courts had misunderstood the first factor of *Blessing* to permit a conferred "*benefit*" rather than "anything short of an unambiguously conferred *right* to support a cause of action brought under § 1983[,] . . . [which] provides a remedy only for the deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." 536 U.S. at 282-83, 122 S. Ct. at 2275 (emphasis added).

Thus, before we analyze the application of the *Blessing* factors to the Privacy Act, in keeping with *Gonzaga*, we must first ask whether Congress created an "unambiguously conferred right" in section 7 of the Privacy Act. 536 U.S. at 283, 122 S. Ct. at 2275; *see also Blessing*, 520 U.S. at 340, 117 S. Ct. at 1359 ("In order to seek redress through § 1983, . . . a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*.").

The relevant portion of section 7 states, "It shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to

---

[4]In *Blessing*, the Supreme Court found that Title IV-D could not be enforced by individuals under § 1983. The Court noted that Title IV-D's "requirement that a State operate its child support program in 'substantial compliance' with Title IV-D" was a "yardstick for the Secretary to measure the *systemwide* performance of a State's Title IV-D program" and thus did not confer a right or "*individual* entitlement to services" on "individual children and custodial parents." 520 U.S. at 343, 117 S. Ct. at 1361.

14

disclose his social security account number." 88 Stat. at 2194. We agree with the Government that this language, aimed at the denial of rights to individuals, is analogous to language cited by the Supreme Court in *Gonzaga* as "explicit 'right- or duty-creating language'":

> Title VI provides: "*No person* in the United States *shall* . . . be subjected to discrimination under any program or activity receiving Federal financial assistance" on the basis of race, color, or national origin. 78 Stat. 252, 42 U.S.C. § 2000d (1994 ed.) (emphasis added). Title IX provides: "*No person* in the United States *shall*, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 86 Stat. 373, 20 U.S.C. § 1681(a) (emphasis added). Where a statute does not include this sort of explicit "right- or duty-creating language" we rarely impute to Congress an intent to create a private right of action.

536 U.S. at 284 n.3, 122 S. Ct. at 2276 n.3. In contrast, the relevant language of the Family Educational Rights and Privacy Act of 1974 ("FERPA"), which the *Gonzaga* Court held not to create personal rights enforceable under § 1983 provides:

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein . . .) of students without the written consent of their parents to any individual, agency, or organization.

536 U.S. at 278-79, 122 S. Ct. at 2273 (quoting 20 U.S.C. § 1232g(b)(1)). The Court explained:

> Unlike the individually focused terminology of Titles VI and IX ("no person shall be subjected to discrimination"), FERPA's provisions speak only to the Secretary of Education, directing that "[n]o funds shall be made available" to any "educational agency or institution" which has a prohibited "policy or practice." 20 U.S.C. § 1232g(b)(1). This focus is two steps removed from the interests of individual students and parents and clearly does not confer the sort of "*individual* entitlement" that is enforceable under § 1983.

*Id.*, 536 U.S. at 287, 122 S. Ct. at 2277 (quoting *Blessing*, 520 U.S. at 343, 117 S.Ct. at 1353).

Admittedly, the language of section 7 falls somewhere in between the language of Titles VI and IX and that of FERPA. The subject of the relevant

16

clauses of Titles VI and IX is "person," whereas the subject of the relevant clause of the Privacy Act is "it." In other words, if the Privacy Act were worded, "No individual may be denied any right, benefit, or privilege provided by law by any Federal, State or local government agency because of such individual's refusal to disclose his social security account number," the language would be more precisely analogous to that of Titles VI and IX. Nonetheless, the Privacy Act clearly confers a *legal right* on *individuals*: the right to refuse to disclose his or her ssn without suffering the loss "of any right, benefit, or privilege provided by law." 88 Stat. at 2194. Thus, we conclude that Congress created an "unambiguously conferred right" in section 7 of the Privacy Act. *Gonzaga*, 536 U.S. at 283, 122 S. Ct. at 2275.[5]

As for the factors of *Blessing*, the language of section 7 is clearly intended to benefit individuals, as discussed above; is specific rather than amorphous; and is clearly mandatory. To read the statute is to see that it easily meets the three criteria of *Blessing*. First, because we have already concluded that Congress created an "unambiguously conferred right" in section 7 of the Privacy Act, we necessarily conclude that the language is intended to benefit individuals.

---

[5]In addition, unlike the Privacy Act, the *Gonzaga* court held that FERPA is essentially "spending legislation," which rarely "confer[s] enforceable rights." *Gonzaga,* 536 U.S. at 279, 122 S. Ct. at 2273.

17

Secondly, the prohibitions of the statute are clear and specific: no "Federal, State or local government agency [may] deny . . . any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number." 88 Stat. at 2194. Finally, the language, "It shall be unlawful" is mandatory rather than precatory. These words indicate a clear prohibition of specific behavior by Federal, State or local government rather than an "aspirational" goal or "yardstick." *See Blessing*, 520 U.S. at 343, 177 S. Ct. at 1361.

However, "Even if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983." *Blessing*, 520 U.S. at 341, 117 S. Ct. at 1360. To establish that the presumption cannot be rebutted, courts must look to whether Congress intended to "foreclose[] a remedy under § 1983" either "expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.*

As the text demonstrates, Congress did not explicitly foreclose an action under § 1983. Thus, the relevant question is whether Congress did so "impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement." *Id*. Again, to read the statute is to answer the question.

18

Section 7 contains no enforcement scheme at all. And, as we have explained above, although section 3 of the Privacy Act contains a comprehensive remedial scheme, section 3 specifically states that its remedial scheme applies *only* to section 3. Thus, the presumption that the rights conferred by section 7 of the Privacy Act may be vindicated via a suit under § 1983 stands, and we hold that the rights conferred by section 7 may be enforced under § 1983.

B. <u>If the Privacy Act allows for a private right of action, whether Congress exceeded its authority in enacting the Privacy Act, rendering the Privacy Act unconstitutional</u>.

Cox argues that if Appellants may sue a State for violation of the Privacy Act via § 1983, then Congress exceeded its authority in passing the Privacy Act. Cox argues that the only possible source of authority for the Privacy Act was Congress's Commerce Clause power. The Government argues, however, that Congress's right to establish the use of ssns arises from the "general welfare clause," which authorizes Congress to spend money for the general welfare. This power is "quite expansive." *Buckley v. Valeo,* 424 U.S. 1, 90, 96 S. Ct. 612, 668, 46 L. Ed. 2d 659 (1976). In addition, the Government argues, the Necessary and Proper Clause "authorizes Congress . . . to adopt measures that bear a rational connection to any of its enumerated powers." *United States v. Edgar*, 304 F.3d

19

1320, 1326 (11th Cir.), *cert. denied*, 123 S. Ct. 679, 154 L. Ed. 2d 577 (2002).

Thus, the Government argues, because Congress had the authority to authorize the creation of ssns, Congress has the authority to "safeguard[] the proper use of social security numbers by prohibiting federal, state, and local governments from conditioning an individual's legal rights on disclosure of his social security number." We agree with the Government and hold that Congress did not exceed its authority in passing the Privacy Act.

C. Whether Georgia qualifies for the "grandfather" exception of section 7(a)(2)(B) of the Privacy Act.

Section 7(a)(2) of the Privacy Act makes an exception for agencies which "maintain[ed] a system of records in existence and operating before January 1, 1975," but only "if such disclosure was required under statute or regulation adopted [before January 1, 1975] to verify the identity of an individual." 88 Stat. at 2194. Thus, to qualify for the grandfather exception, Georgia must show that it meets two criteria: (1) that it maintained a system of records operating before January 1, 1975; and (2) that the system required the disclosure of an individual's ssn to verify the identity of that individual.[6]

---

[6]Cox states that "[t]he registration card set forth in Section 34-609 [now O.C.G.A. § 21-2-219] contained a blank for the individual's social security number '(If known at the time of application)'" and that the Form was not changed to delete the phrase "if known at the time of the

20

Because we hold that the rights conferred by the Privacy Act may be vindicated via a private right of action under § 1983, we remand the issue of whether Georgia qualifies for the "grandfather" exception of the Privacy Act to the district court to address in the first instance.

D. Whether Georgia's voter registration forms comply with the notice requirements of section 7(b) of the Privacy Act.

Appellants argue that Georgia's Voter Registration Form fails to comply with the notification requirements of section 7(b) of the Privacy Act because the Form does not inform voters under what authority the demand for their ssns is made. Secondly, Appellants argue that the Form promises confidentiality and "internal" use only. Cox admits that state law allows the ssns to be disclosed to other Georgia state agencies if requested by those agencies.

However, Cox notes that the Form has been modified to contain citations to O.C.G.A. §§ 21-2-219 and 21-2-220 as statutory authority for requiring the ssns. Cox also states that the other modification to the card is that it will now explain

application," until 1995. Thus, before 1975, the ssn was not required, it was only required "if known at the time of the application." Cox's acknowledgment may warrant summary judgment for Appellants because it would indicate that Georgia cannot meet the second requirement. Nonetheless, we remand this issue to the district court because further fact-finding may be necessary and in deference to "the general rule . . . that a federal appellate court does not consider an issue not passed upon below." *Iraola & CIA, SA v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1284-85 (11th Cir. 2003) (internal quotation omitted).

that "internal use only" "means to identify and verify the identity of voters." If it is true that other state agencies in Georgia will have access to Georgia voters' ssns, this modification would seem insufficient to bring the Form into compliance with section 7(b) of the Privacy Act. The district court did not reach this issue because it found that the Privacy Act could not be enforced by a private right of action. Thus, we remand this issue to the district court to consider in the first instance.

E. Whether the district court erred in holding that section 1971 of the Voting Rights Act may not be enforced by a private right of action under § 1983.

Appellants also contend that Georgia's requirement that voters supply their ssns in order to vote violates 42 U.S.C. § 1971(a)(2)(B) of the Voting Rights Act, which forbids the practice of disqualifying potential voters for their failure to provide information irrelevant to determining their eligibility to vote. This provision was intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters. *See Condon v. Reno,* 913 F. Supp. 946, 949-50 (D.S.C. 1995). For example, one "such tactic[] [was to]

disqualify[] an applicant who failed to list the exact number of months and days in his age." *Id.*

Section 1971(c), the provision authorizing the Attorney General to sue to enforce § 1971, was added to the statute by the Civil Rights Act of 1957. The district court found that Congress intended § 1971(c) to foreclose the possibility of a private right of action under § 1983. The district court relied on the Sixth Circuit's holding in *McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000), that § 1971 is only enforceable by the Attorney General.

In *McKay*, the Sixth Circuit relied entirely on *Willing v. Lake Orion Community Schools Board of Trustees*, 924 F. Supp. 815, 820 (E.D. Mich. 1996), which in turn relied entirely on *Good v. Roy,* 459 F.Supp. 403, 405-06 (D. Kan. 1978). Thus, the extent of the analysis relied on by the Sixth Circuit is the following from *Good*: "Furthermore, subsection (c) provides for enforcement of the statute by the Attorney General with no mention of enforcement by private persons. . . . [T]he unambiguous language of Section 1971 will not permit us to imply a private right of action." 459 F.Supp. at 405-406.

However, in *Allen v. State Board of Elections*, 393 U.S. 544, 89 S. Ct. 817, 22 L. Ed. 2d 1 (1969), and *Morse v. Republican Party of Virginia*, 517 U.S. 186, 116 S. Ct. 1186, 134 L. Ed. 2d 347 (1996) (plurality opinion), the Supreme Court

23

found that other sections of the Voting Rights Act, 42 U.S.C. §§ 1973c and 1973h, respectively, could be enforced by a private right of action, even though those sections also provide for enforcement by the Attorney General.

In *Allen*, which dealt with the provision of the Voting Rights Act requiring judicial scrutiny of alterations of voting qualifications or procedures, the Court reasoned that the goals of the statute were much more likely to be reached if private citizens were not "required to depend solely on litigation instituted at the discretion of the Attorney General." 393 U.S. at 556, 89 S. Ct. at 827. Thus, the *Allen* Court found that the possibility of enforcement by the Attorney General did not preclude enforcement by private citizens, 393 U.S. at 556-57, 89 S. Ct. at 827, which is contrary to the conclusion reached by *Good* and relied on by the Sixth Circuit. *See also Sierra Club v. Andrus,* 610 F.2d 581, 589 n.12 (9th Cir. 1979) (following *Allen*, the court noted that a provision in the Rivers and Harbors Act of 1899 expressly providing for enforcement by the Attorney General "[did] not necessarily preclude a private right of action"), *rev'd sub nom* on other grounds, *California v. Sierra Club*, 451 U.S. 287, 101 S.Ct. 1775 (1981).[7]

_____

[7]The Supreme Court held that the language of the Rivers and Harbors Act did not show congressional intent to "confer federal rights upon [a particular class of] beneficiaries," but was instead merely "a general proscription of certain activities"). *California v. Sierra Club*, 451 U.S. at 294, 101 S. Ct. at 1779.

Furthermore, the provision giving the Attorney General the right to bring a civil suit under § 1971 was not added to § 1971 until 1957. Therefore, from the enactment of § 1983 in 1871 until 1957, plaintiffs could and did enforce the provisions of § 1971 under § 1983. *See, e.g.*, *Smith v. Allwright*, 321 U.S. 649, 64 S. Ct. 757, 88 L. Ed. 987 (1944); *Chapman v. King*, 154 F.2d 460 (5th Cir. 1946);[8] *Brown v. Baskin*, 78 F.Supp. 933 (D.S.C. 1948).

In House Report 291, in which the House Judiciary Committee recommended passage of the provision giving the Attorney General the right to enforce the Voting Rights Act, the Committee first stated that the bill's purpose was "to provide means of *further* securing and protecting the civil rights of persons within the jurisdiction of the United States." H.R. REP. NO. 85-291 (1957), *reprinted in* 1957 U.S.C.C.A.N. 1966, 1966 (emphasis added). The Committee also noted that "[s]ection 1983 . . . has been used [by individuals] to enforce . . . section 1971." H.R. REP. NO. 85-291, *reprinted in* 1957 U.S.C.C.A.N. at 1977. Nothing in the Report suggests that the Committee intended the

---

[8]In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

provision granting the Attorney General authority to bring suit to foreclose the continued use of §1983 by individuals. In fact, the Committee noted:

> Th[e] right to vote . . . is . . . the foundation of our representative form of Government. It is the sole means by which the principle of consent of the governed as the source of governmental authority is made a living thing. Deprivation of the right to vote is the first step on the road to tyranny and dictatorship. . . . [T]he sovereign . . . must preserve this fundamental and basic right against any and all unlawful interference. That the proposal of this section does that very thing is clear.

H.R. REP. NO. 85-291, *reprinted in* 1957 U.S.C.C.A.N. at 1977. This language demonstrates an intense focus on protecting the right to vote and does not support the conclusion that Congress meant merely to substitute one form of protection for another. We agree with Appellants that it is highly unlikely that in "enacting civil rights legislation for the first time since the Reconstruction era [Congress] would simultaneously withdraw existing protection" from § 1971.

Furthermore, in *Morse*, dealing with the provision of Voting Rights Act prohibiting the use of a poll tax, the Supreme Court found that a private right of action had not been foreclosed even though the enforcement scheme of the Voting

26

Rights provision at issue gave the Attorney General the right to sue for violations and was more complete than that of § 1971. *See Morse*, 517 U.S. at 193, 116 S. Ct. at 1192-93.

Appellants also point out that in 1957, in what is now § 1971(d), Congress removed procedural roadblocks to suits under § 1971 by specifying that there was no requirement that a party exhaust judicial or administrative remedies before bringing suit. Appellants argue that this language could not have applied to the Attorney General and thus was meant to "remove[] roadblocks for the previously authorized private rights of action under § 1971." We agree.

We conclude that neither § 1971's provision for enforcement by the Attorney General nor Congress's failure to provide for a private right of action expressly in § 1971 *require* the conclusion that Congress did not intend such a right to exist. Thus, we hold that the district court erred by finding that Congress's provision for enforcement by the Attorney General in § 1971(c) precluded continued enforcement of § 1971 by a private right of action under § 1983.

The district court's finding was dispositive on the issue of whether the rights guaranteed by the Voting Rights Act may be enforced by a private right of action under § 1983. *Blessing*, 520 U.S. at 341, 117 S. Ct. at 1360 (noting that even if a statute creates an individual right, there is still no private right of action

if Congress intended to "foreclose[] a remedy under § 1983 . . . by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983"). Thus, the district court did not need to determine whether § 1971 created enforceable individual rights. Because we conclude that the district court's finding that § 1971's provision for enforcement by the Attorney General precluded private enforcement was error, we must apply the *Gonzaga/Blessing* analysis to § 1971 to determine whether the statue creates rights enforceable by individuals under § 1983.

As discussed above, under *Gonzaga*, we must first ask whether the statute contains "explicit right- or duty-creating language." 536 U.S. at 284 n.3, 122 S. Ct. at 2276 n.3 (internal quotations omitted); see also *Alexander v. Sandoval*, 532 U.S. 275, 286-89, 121 S. Ct. 1511, 1519-21, 149 L. Ed. 2d 517 (2001) (noting that whether or not a statute creates an implied private right of action depends on Congress's intent, which must be determined by looking first to the text itself). Section 1971 states, "No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an [immaterial] error or omission on any record or paper relating to any application, registration, or other act requisite to voting . . . ." 42 U.S.C. § 1971(a)(2)(B). This language is clearly analogous to the right-creating language cited by the Supreme Court in *Gonzaga*,

536 U.S. at 284 n.3, 122 S. Ct. at 2276 n.3, discussed above. The subject of the sentence is the person acting under color of state law, but the focus of the text is nonetheless the protection of each individual's right to vote.

Next, as required by *Blessing*, the statute clearly provides rights which are specific and not amorphous. The statute protects an individual's right to vote; specifically, the statute forbids a person acting under color of law to disqualify a potential voter because of his or her failure to provide unnecessary information on a voting application.

Finally, the language of the statute is mandatory rather than precatory: "*No person* acting under color of law *shall . . . deny* the right of any individual to vote . . . ." 42 U.S.C. § 1971(a)(2)(B) (emphasis added).

Thus, we hold that the provisions of section 1971 of the Voting Rights Act may be enforced by a private right of action under § 1983.

F. Whether the disclosure of his or her ssn is "material" in determining whether a person is qualified to vote under Georgia law for purposes of the Voting Rights Act.

Section 1971(a)(2)(B) of the Voting Rights Act is often referred to as "the materiality provision," and, as discussed above, requires that no person be denied the right to vote "because of an error or omission on any record or paper relating

29

to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 42 U.S.C. § 1971(a)(2)(B). Cox argues that because Georgia's Voter Registration Form requires that potential voters supply their ssns, they are not "qualified under State law to vote" unless they have supplied their ssns and thus filled out the Form. However, Appellants point out that according to the Form and O.C.G.A. § 21-2-216, the only *qualifications* for voting in Georgia are U.S. Citizenship, Georgia residency, being at least eighteen years of age, not having been adjudged incompetent, and not having been convicted of a felony. O.C.G.A. § 21-2-216 (1998).

Because the district court found that section 1971 of the Voting Rights Act did not provide for a private right of action, the court did not reach the issue of whether the disclosure of a person's ssn is "material" in determining whether he or she is qualified to vote under Georgia law for purposes of § 1971. Thus, we remand this issue to the district court to address in the first instance.

## V. CONCLUSION

A. Privacy Act Claims

In summary, we hold that the rights conferred by the Privacy Act may be vindicated by a private suit under § 1983. We also hold that Congress did not exceed its authority in enacting the Privacy Act.

We remand to the district court the issues of whether Georgia qualifies for the "grandfather" exception of section 7(a)(2)(B) of the Privacy Act and whether Georgia's Voter Registration Form complies with the notice requirements of section 7(b) of the Privacy Act.

B. <u>Voting Rights Act Claims</u>

We hold that the district court erred in finding that section 1971 of the Voting Rights Act does not provide for enforcement by a private right of action under § 1983. We remand to the district court the issue of whether the disclosure of a potential voter's ssn is "material" in determining whether he or she is qualified to vote under Georgia law for purposes of section 1971 of the Voting Rights Act.

REVERSED and REMANDED.