DAVIS, Senior Circuit Judge,
concurring in part and dissenting in part:
Maryland Rules of Procedure 16-811.5 and 16-811.6, adopted in 2014, require that each attorney admitted to practice as a member of the Maryland bar disclose her social security number (“SSN”) to the treasurer of the Client Protection Fund (“the Fund”) or face suspension of her license to practice law. Michael Tankers-ley, an attorney who has long been admitted to practice in Maryland but has apparently never actually lived, worked, or practiced in the state, contends that, as applied to him, these Maryland Rules violate the federal Privacy Act of 1974. Section 7(a)(1) of the Privacy Act provides that “[i]t shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual’s refusal to disclose his social security account number.” Pub. L. No. 93-579, § 7(a)(1), 88 Stat. 1896 (codified at 5 U.S.C. § 552a note).
Upon suspension of his law license for refusing to provide his SSN,’ Tankersley brought this suit against all Maryland Court of Appeals judges, the Clerk of Court, and the trustees of the Fund (together, “Appellees”) in their official capacities. The district court granted Appellees’ motion to dismiss based on its determina *400 tion in a previous case that both the Welfare Reform Act, 42 U.S.C. § 666, and the Tax Reform Act of 1976, 42 U.S.C. § 405, supersede the Privacy Act’s guarantee that an individual may not be denied any legal right, benefit, or privilege for failing to disclose her SSN, My friends in the majority affirm on the ground that § 405, but not § 666, supersedes section 7(a)(1) of the Privacy Act as applied in this case.
While I agree with the majority that § 666 does not supersede the Privacy Act as it pertains to Tankersley, I respectfully dissent from its holding that § 405 does supersede the Privacy Act. I would also hold that Tankersley has a private right of action to enforce his Privacy Act rights under 42 U.S.C. § 1983. Thus, in my view, Tankersley’s suspension from practicing law for refusing to disclose his SSN violated his Privacy Act rights. Accordingly, I would reverse the district court’s judgment and remand with instructions to grant summary judgment for Tankersley.
I.
This Court reviews de novo a dismissal for failure to state a claim, Kenney v. Indep. Order of Foresters, 744 F.3d 901, 905 (4th Cir. 2014), and we likewise review de novo a denial of summary judgment, Nourison Rug Corp. v. Parvizian, 535 F.3d 295, 299 (4th Cir. 2008). Because I agree with the majority that § 666 does not supersede Tankersley’s Privacy Act rights, as Tankersley is not an “applicant” for a professional license, I begin by considering whether § 405 supersedes Tankersley’s rights under the Privacy Act. Unlike the majority, I conclude that it does not.
II.
Under the Tax Reform Act,
any State (or political subdivision thereof) may, in the administration of any tax, general public assistance, driver’s license, or motor vehicle registration law within its jurisdiction, utilize the social security account numbers issued by the Commissioner of Social Security for the purpose of establishing the identification of individuals affected by such law, and may require any individual who is or appears to be so affected to furnish to such State (or political subdivision thereof) or any agency thereof having administrative responsibility for the law involved, the social security account number ... issued to him by the Commissioner of Social Security.
42 U.S.C. § 405(c)(2)(C)(i). The Act also provides that, “[i]f and to the extent that any provision of Federal law heretofore enacted is inconsistent with the policy set forth in clause (i), such provision shall ... be null, void, and of no effect.” Id. § 405(c)(2)(C)(v). Appellees argue, and the majority agrees, that § 405 supersedes Section 7(a)(1) of the Privacy Act to.the extent that it enables states to require individuals to furnish their SSNs in the administration of any tax law. See Appel-lees’ Br. 26. .
I would hold, however, that § 405 does not supersede the Privacy Act in this case for three reasons: First, the Fund’s collection of SSNs is not an effort undertaken by the state “in the administration of any tax” law. See §■ 405(c)(2)(C)(i). Second, the Fund is not an entity to which the state may require individuals to furnish their SSNs, as it is not a direct agent of the state itself or a .state “agency ... having administrative responsibility for” any tax law. See id. Third, Tankersley is not an “individual who is or appears to be ... affected” by any Maryland tax law. See id. Thus, § 405 does not authorize the Maryland Court of Appeals to penalize Tankersr ley for refusing to disclose his SSN, and it does not supersede section 7(a)(1) of the Privacy Act as applied here.
*401 A.
The language of § 405 is fairly limiting. The statute specifies (1) who may require the disclosure of SSNs (a “State (or political subdivision thereof)”); (2) for what purpose (“in the administration of any tax ... law within [the State’s] jurisdiction”); (3) to whom an individual may be required to make the disclosure (“to such State (or political subdivision thereof) or any agency thereof having administrative responsibility for the law involved”); and, finally, (4) who may, be required to disclose her SSN (“any individual who is or appears to be ... affected [by the State tax law]”). § 405(c)(2)(C)(i). I begin by examining the first two requirements: whether the mandatory disclosure of SSNs at issue in this case is an effort undertaken by the state of Maryland “in the administration of any tax” law. See id.
Maryland law requires that, each year, the Fund must “provide a list -of lawyers who have paid an annual fee to the Fund during the previous fiscal year” to the State Department of Taxation “to assist the Department in identifying new businesses within the State” and to the Comptroller “to assist the Comptroller in determining whether each lawyer on the list has paid all undisputed taxes and unemployment insurance contributions.” Md. Code Ann., Bus. Occ. & Prof. § 10-313(a). For each person listed, the Fund must provide “the federal tax identification number of the person or, if the person does not have a federal tax identification number, the Social Security number of the person.” Id. § 10-313(b)(2)(ii). In an apparent effort to comply with this state law, the Maryland Court of Appeals adopted Maryland Rules of Procedure 16-811.5 and 16-811.6 and amended the rules of admission to the Maryland bar, see Md. Admis. R. 2(b), to require that applicants and members of the bar supply their SSNs to the Fund.
The Fund’s stated purpose, however, is unrelated to the state’s administration of any tax law: “The' purpose of the Fund is to maintain the integrity of the legal profession by paying money to reimburse losses caused by defalcations of lawyers.”' Md. Code Ann., Bus. Occ. & Prof. § 10-311(b). It is therefore dubious to conclude that Maryland has acted “in the administration of any tax” law by requiring the Fund, an entity that does not itself collect taxes and that exists for an entirely distinct purpose, to collect SSNs and supply them to the Comptroller for the Comptroller’s use in monitoring compliance with tax laws.
Relatedly, the Maryland Rules at issue in this case are not the state laws requiring the Fund to provide SSNs to state tax authorities; instead, the Rules under review are Maryland Rules 16-811.5 and 16-811.6, which the Court of Appeals promulgated to require bar members to furnish their SSNs to the Fund. The suggestion that the state (through its Court of Appeals) acted “in the administration of any tax” law in promulgating Rules requiring that the Fund collect SSNs from bar members so that the Fund can comply with a separate Maryland law that requires it to provide SSNs to Maryland tax authorities so that those authorities may check compliance with tax laws is thus all the more attenuated.'[1] Accordingly, if does not ap *402 pear that § 405 authorizes the Maryland Rules at issue.
B.
In any event, § 405 also specifies the type of entity to which a state may require individuals to supply their SSNs: a state may mandate SSN disclosure “to [a] State (or political subdivision thereof) or any agency thereof having administrative responsibility for the law involved.” § 405(c)(2)(C)(i). Appellees argue that the Fund, in collecting SSNs under the Maryland Rules, is acting as an agent of the state, and since § 405 authorizes “the State” as well as state agencies responsible for administering tax laws to collect SSNs, the Maryland Rules comply with § 405. See Appellees’ Br. 30-35. In other words, Appellees contend that two groups may collect SSNs under § 405 — the state, including its direct agents, and state agencies with “administrative responsibility for the law involved” — and that the Fund belongs in the former group.[2] See id. at 32. The majority agrees.
The language of § 405 is not so expansive, however, as to allow us to consider the Fund a direct agent of the state of Maryland. In interpreting a statute, we must “give effect to every provision and word in a statute and avoid any interpretation that may render statutory terms meaningless or superfluous.” Discover Bank v. Vaden, 396 F.3d 366, 369 (4th Cir. 2005). If the phrase “the State (or political subdivision thereof)” were to include any state agency, such as the Fund, then the next phrase in § 405, authorizing SSN collection by “any [state] agency ... having administrative responsibility for the law involved,” would be superfluous. See § 405(c)(2)(C)(i).
Likewise, by expressly providing that “any [state] agency ... having administrative responsibility for the law involved” may collect SSNs, Congress appears to have specifically excluded from § 405’s purview state ágencies, like the Fund, that are not responsible for administering tax laws. See id. If it intended otherwise, Congress could simply have established that a state may require SSN disclosure to “any state agency” and left it at that. See Reyes-Gaona v. N.C. Growers Ass’n, 250 F.3d 861, 865 (4th Cir. 2001) (“[T]he doctrine of expressio un[ius] est exclusio alter-áis instructs that where a law expressly describes a particular situation to which it shall apply, what was omitted or excluded was intended to be omitted or excluded.”); cf. Dep’t of Homeland Sec. v. MacLean, — U.S. —, 135 S.Ct. 913, 919, 190 L.Ed.2d 771 (2015) (“Thus, Congress’s choice to say ‘specifically prohibited by law’ rather than ‘specifically prohibited by law, rule, or regulation’ suggests that Congress meant to exclude rules and regulations.”).
Appellees argue, on the other hand, and the majority agrees, that the statutory canon requiring that we attempt to “give effect to every provision and word in a statute,” Discover Bank, 396 F.3d at 369, cuts the other direction. See Appellees’ Br. 32-33. They contend that the phrase “State (or political subdivision thereof)” must include the state’s direct agents for that term to have any meaning, as a state cannot act of its own accord. See id. at 32. Yet that proposition does nothing to demonstrate that the Fund in particular quali- *403 fíes as a direct agent of the state. Although the Court of Appeals might meet this description, see Md. Const., Art. IV, § 1 (vesting Maryland’s judicial power in the Court of Appeals), I see no reason to conclude that the Fund, a subset of the Maryland Court of Appeals, may serve as a proxy for the state itself.
That Congress, in enacting § 405, did not intend for a state agency to qualify as a stand-in for the “State (or political subdivision thereof)” is again exemplified by § 405’s inclusion of a subsequent phrase specifically pertaining to state agencies — a statutory phrase that would more naturally describe the Fund, if only the Fund were a state agency with administrative responsibility for any Maryland tax law. See § 405(c)(2)(C)(i). Accordingly, the majority’s labored analysis, reasoning that the Maryland Court of Appeals is an agent of the state and the Fund is an agent of the Court of Appeals and thus the Fund is an agent of the state, forgets that the relevant question is whether the Fund is a direct agent of the state — the personification of the state itself — as opposed to a state agency organized and managed under the-auspices of the state. Because the Fund is neither a direct state agent nor an agency with administrative responsibility for any Maryland tax law, § 405 does not authorize the Maryland Rules at issue here, which require disclosure of SSNs to the Fund.
C.
Finally, even if § 405 does authorize the Fund’s collection of SSNs in some circumstances, it does not allow Maryland to require the collection of Tankersley’s SSN in particular, as Tankersley is not an “individual who is or appears to be” affected by any Maryland tax law. See id.
Although Tankersley has been licensed to practice law in Maryland since 1986, he has been a resident of Virginia or Washington, D.C., and -has worked in Washington, D.C., for the duration of that time, J.A. 114 — indeed, he has also been licensed to practice law in Washington, D.C., since 1987, J.A. 10. For the nearly three decades that Tankersley has been licensed in Maryland, he has not owned property in Maryland, and he has not owed Maryland any taxes or unemployment insurance contributions. JA. 114. Moreover, Tankersley has annually reported his home and work addresses to the Fund, which uses this information each year, along with information regarding Tankersley’s bar memberships outside of Maryland, to determine whether, he is subject to a mandatory assessment. See J.A. 114-15; Regs, of the Client Protection Fund of the Bar of Md. Currently Effective, § (i)(l)-(3), http:// www.courts.state.md.us/cpfipdfs/ regulations.pdf (last visited Aug. 25, 2016).
Thus, not only does Tankersley not owe any taxes in Maryland (nor has he for nearly thirty years), but he also does not appear to owe any taxes in Maryland,-as is clear from the information that Tankersley provides the Fund on a yearly basis. Someone who fives in Virginia and works in Washington, D.C., where he is licensed to practice law, does not “appear[] to be affected” by Maryland tax laws simply because he is also licensed to practice law in Maryland, particularly when he has not practiced law there and has no other apparent connection to the state.
Appellees contend that a more individualized approach to SSN collection would “require an unworkable, burdensome, administrative mechanism to determine whether there was some basis for taxing the specific individual.” Appellees’ Br. 29. Perhaps so. Yet, as mentioned above, the Fund already uses individual bar members’ information to determine whether each attorney owes a mandatory assess- *404 raent, so the requisite mechanism already exists. More to the point, § 405 is clear in specifying who may be required to disclose her SSN: “any individual who is or appears to be” affected by state tax law. Appellees cannot eschew this language due to policy concerns about inefficiency.[3] Given that we must, to the extent possible, attempt to construe § 405 so as to preserve the Privacy Act, see Morton v. Mancari, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (“[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.”), Appellees’ argument concerning the relative ease and efficiency of a blanket mandatory collection of all licensed attorneys’ SSNs is unpersuasive.
Lastly, it is ironic that, upon acknowledging that we must be “mindful of our duty to give effect* if possible, to every clause and word of a statute,” ante at 399 (citations and internal quotation marks omitted), the majority ignores the precise wording of § 405 — which authorizes the mandatory collection of an SSN only from an “individual who is or appears to be” affected by Maryland tax laws, § 405(c)(2)(C)(i) — and instead declares that “a fair reading of § 405(c)(2)(C)© extends to all attorneys licensed to practice in Maryland,” ante at 399. Congress did not enact such an expansive statute, and we should not transform § 405 into one, particularly where we are obligated to give effect to every word in a statute and to interpret § 405 in a manner that preserves the federal Privacy Act (and the important protections it provides), to the extent possible.
Accordingly, I would hold that' § 405 does not authorize the Fund to penalize Tankersley for failing to supply his SSN, as Tankersley is not an individual “who is or appears to be affected” by any Maryland tax law.
III.
Having concluded that neither § 666 nor § 405 supersedes Tankersley’s rights under section 7(a)(1) of the Privacy Act, the question remains whether Tankersley has a private right of action to enforce his rights. Tankersley argues that he may pursue his claim for declaratory and in-junctive relief under 42 U.S.G. § 1983. See Appellant’s Br. 36-43.1 agree.
. Section 1983 “imposes liability on anyone who, under color of state law or regulation, deprives a person ‘of any rights, privileges, or immunities secured by the Constitution and laws.’ ” Blessing v. Freestone, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). A plaintiff seeking redress under § 1983 “must assert the violation of a federal right, not merely a violation of federal law.” Id. (citing Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 106, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989)). We consider three factors when determining whether a particular statutory provision gives rise to a federal right. Id. “First, Congress must have intended that the provision in question benefit the plaintiff.” Id. (citing Wright v. City of Roanoke Redevelopment & Hous. Auth., *405 479 U.S. 418, 430, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)). The Supreme Court has clarified that the federal right must be “unambiguously conferred”; it is insufficient that “the plaintiff falls within the general zone of interest that the statute is intended to protect.” Gonzaga Univ. v. Doe, 536 U.S. 273, 283, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). “Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not ‘so vague and amorphous’ that its enforcement would strain judicial competence.” Blessing, 520 U.S. at 340-41, 117 S.Ct. 1353 (quoting Wright, 479 U.S. at 431-32, 107 S.Ct. 766). “Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.” Id. at 341, 117 S.Ct. 1353 (citing cases).
However, “[e]ven if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983. Because our inquiry focuses on congressional intent, dismissal is proper if Congress ‘specifically foreclosed a remedy under § 1983.’ ” Id. (quoting Smith v. Robinson, 468 U.S. 992, 1005 n.9, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984)). Congress may do so expressly or impliedly, such as by “creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.” Id. (citing Linvadas v. Bradshaw, 512 U.S. 107, 133, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994)).
A.
While the question of whether section 7(a)(1) of the Privacy Act confers an individual right enforceable under § 1983 is an issue of first impression in this Circuit,[4] the Eleventh Circuit has answered this question in the affirmative. See Schwier v. Cox, 340 F.3d 1284, 1292 (11th Cir. 2003). The Ninth Circuit, the only other one of our sister circuits to resolve the issue,[5] agreed that section 7(a)(1) of the Privacy Act creates an individual right, but it held that Congress intentionally foreclosed § 1983 as a remedy. See Dittman v. California, 191 F.3d 1020, 1028-29 (9th Cir. 1999).
I would hold that, in enacting section 7(a)(1) of the Privacy Act, Congress created an individual right enforceable under § 1983. Section 7(a)(1) of the Privacy Act provides that “[i]t shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual’s refusal to disclose his social security account number.” § 7(a)(1). Even though this provision proscribes the activity of a “Federal, State or local government agency,” the statute is unambiguously focused on the right of an individual to retain her legal. rights, benefits, and privileges when refusing to disclose her SSN. See Schwier, 340 F.3d at 1292 (“[T]he Privacy Act clearly confers a legal right on individuals: the right to refuse to disclose his or her ssn without suffering the loss ‘of any right, benefit, or privilege provided by law.’”). Moreover, Congress *406 explained that it enacted the Privacy Act “to provide certain safeguards for an individual against an invasion of personal privacy,” Pub. L..No. 93-579, § 2(b), 88 Stat. 1896, expressing an intent to create and preserve individual rights.
Section 7(a)(1) of the Privacy Act differs in this way from the Family Educational Rights and Privacy Act' of 1974. (“FER-PA”) at issue in Gonzaga University v. Doe. See 536 U.S. at 276, 122 S.Ct. 2268. The Supreme Court in Gonzaga determined that FERPA, which provides that “[n]o funds shall be made available ... to any educational agency ... which has a policy or practice of permitting the release of education records ... of students without the written consent of them parents,” 20 U.S.C. § 1232g(b)(l), did not" contain the requisite “rights-ereating” language to allow for enforcement under § 1983. Gonzaga, 536 U.S. at 287, 122 S.Ct. 2268. The Court explained that the statute’s focus on funding for educational agencies “is two steps removed from the interests of individual studerits and parents and clearly does not confer the sort of ‘individual entitlement’ that is enforceable under § 1983.” Id. Section 7(a)(1) of the Privacy Act, by contrast, establishes that individuals are entitled to decline to provide their SSNs while retaining their legal rights, benefits, and privileges. In doing so, section 7(a)(1) plainly confers an individual right and satisfies the first requirement for enforcement under § 1983. See Schwier, 340 F.3d at 1292; Dittman, 191 F.3d at 1028.
Further, the individual right created by section 7(a)(1) is not “ ‘so vague and amorphous’ that its enforcement would strain judicial competence.” Blessing, 520 U.S. at 340-41, 117 S.Ct. 1353 (quoting Wright, 479 U.S. at 431-32, 107 S.Ct. 766). An individual’s right to retain “any right, benefit, or privilege provided by law” is clearly defined. See Dittman, 191 F.3d at 1028 (“[T]he statutory obligation imposed on governmental bodies is clear: A governmental body may not deny any individual any right, benefit, or privilege because she refuses to disclose her social security number, unless otherwise permitted by law.”). Moreover, the Act unambiguously imposes a binding and mandatory obligation on the states by using the phrase “it shall be unlawful.” See § 7(a)(1). Tankersley has thus established a rebuttable presumption of enforceability of his Privacy Act rights under § 1983.
B.
Appellees have failed to counter this presumption by demonstrating that Congress “specifically foreclosed a remedy under § 1983,” see Blessing, 520 U.S. at 341, 117 S.Ct. 1353 (quoting Smith, 468 U.S. at 1005 n.9, 104 S.Ct. 3457), as their argument rests primarily on their contention that the Privacy Act does not confer ah individual right,[6] see Appellees’ Br. 39-45.
As it happens, Congress has not foreclosed a remedy under § 1983. In concluding otherwise, the Ninth Circuit reasoned that, “[although the prohibitions of *407 § 7(a)(1) apply to all governmental entities, including state and local governments, by limiting the scope of the Privacy Act’s civil remedy provision, 5 U.S.C. § 552a(g), Congress clearly intended to ‘foreclose private enforcement’ against any entity other than federal agencies.” Dittman, 191 F.3d at 1029. The civil remedy provision to which the Ninth Circuit referred, however, applies only to section 3 of the Privacy Act, which concerns the maintenance of individuals’ records and which itself only regulates federal agencies. See 5 U.S.C. § 552a. The civil remedy provision does not apply to section 7, the section at issue in this case. See Schwier, 340 F.3d at 1289 (“Pittman failed to recognize that the remedial scheme of section 3 applies only to section 3 and has no bearing on section 7.”). Appellees acknowledge as much in their brief. See Appellees’ Br. 38 (“The only private cause of action created under the Privacy Act exists under Section 3. of that Act, and is limited to claims against federal entities.”). As the Privacy Act establishes “no enforcement scheme at all” with respect to the individual rights that section 7 confers, Congress has not foreclosed enforcement of these rights under § 1983.[7] Schwier, 340 F.3d at 1292.
IV.
Thus, neither 42 U.S.C. § 666 nor 42 U.S.C. § 405 supersedes section 7(a)(1) of the Privacy Act and authorizes the enforcement of Maryland Rules 16-811.5 and 16-811.6 against Tankersley. Moreover, 42 U.S.C. § 1983 confers a private right of action for. Tankersley to enforce his Privacy Act rights. Because this case involves no genuine issue of material fact, see Fed. R. Civ. P. 56,1 would reverse and remand to the district court for entry of summary judgment[8] in favor of Tankersley.

. Tankersley characterizes the Fund’s duty to pass along SSNs to state tax authorities as a "game of telephone across state agencies,” Appellant’s Br. 31, that is part of a "patchwork” scheme, idL at 32, involving .a "hodgepodge of statutes through which SSNs wend their way from the [Fund] to state taxation authorities,” Reply'Br. 13. While the statutory scheme might not quite warrant this colorful description, the scheme is certainly complex, and the Maryland Rules' connection to the state’s administration of tax laws is tenuous at best.

. Notably, Appellees expressly concede that the Fund does not qualify for the latter group. That is, they do not suggest that the Fund is a state agency with administrative responsibility for any tax law. See Appellees’ Br, 31 ("[F]or purposes of § 405, the Fund is not itself a state ‘agency’ that administers a tax, but rather an agent of the State housed in the judicial branch.”).

. Indeed, even if it were necessary to look beyond the statutory text, the relevant legislative history demonstrates that Congress intended for § 405 to be limited in scope. When advocating the passage of § 405, the Senate Committee on Finance stated that it "believe[d] that State and local governments should have the authority to use social security numbers for identification purposes when they consider it necessary for administrative purposes.” S. Rep. No. 94-938, at 391 (1976) (emphasis added). Maryland cannot in good faith consider a more efficient system strictly necessary, especially when the state's current administrative system is already capable of the task at hand.

. Because the district court below concluded that § 666 and § 405 supersede Section 7(a)(1) of the Privacy Act, it did not reach this issue. See J.A. 123-24. The district court in Greidinger v. Almand, which served as the basis for the district court’s decision in this case, noted that this is "an open question in the Fourth Circuit,” but it also declined to resolve the issue. 30 F.Supp.3d 413, 426 (D. Md. 2014).

. This issue has come before the Tenth Circuit as well, but that court acknowledged the existing circuit split and dismissed the plaintiffs Privacy Act claims for other reasons. See Gonzalez v. Vill. of West Milwaukee, 671 F.3d 649, 662-63 (10th Cir. 2012).

. Appellees also assert that Tankersley cannot pursue his Privacy Act rights under § 1983 because "Congress lacked authority to abrogate the Eleventh Amendment immunity of the states in the Privacy Act.” Appellees’ Br. 38. The Supreme Court has consistently recognized, however, that "official-capacity actions for prospective relief are not treated as actions against the state.” Will v. Mich. Dep’t of State Police, 491 U.S. 58, 71 n.10, 109 S.Ct 2304, 105 L.Ed.2d 45 (1989) (quoting Kentucky v. Graham, 473 U.S. 159, 167 n.14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). Accordingly, because Tankersley seeks injunc-tive relief, not damages, from state officials in their official capacity, this case does not implicate any Eleventh Amendment concerns. See id. (“Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983-”).

. Tankersley argues in the alternative that a federal court may exercise its "inherent equitable power to enjoin violations of federal law.” Reply Br. 19. Because I conclude that ■Tankersley has a private right of action to enforce his section 7(a)(1) Privacy Act rights under § 1983, I do not address this issue.

. The parties have sufficient notice that we may grant summary judgment, as Tankersley filed a motion seeking this relief and Appel-lees styled their dispositive motion as a "Motion to Dismiss, or, in the Alternative, for Summary Judgment.” See J.A. 116.