**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-1081

MICHAEL EDWARD TANKERSLEY,

Plaintiff – Appellant,

v.

JAMES W. ALMAND, in his official capacity as Trustee of the Client Protection Fund; DOUGLAS M. BREGMAN, in his official capacity as Trustee of the Client Protection Fund; CHARLES BAGLEY, IV, in his official capacity as Trustee of the Client Protection Fund; JOSEPH B. CHAZEN, in his official capacity as Trustee of the Client Protection Fund; CECELIA ANN KELLER, in her official capacity as Trustee of the Client Protection Fund; PATRICK A. ROBERSON, in his official capacity as Trustee of the Client Protection Fund; LEONARD H. SHAPIRO, in his official capacity as Trustee of the Client Protection Fund; DONNA HILL STATEON, in her official capacity as Trustee of the Client Protection Fund; DAVID WEISS, in his official capacity as Trustee of the Client Protection Fund; CLIENT PROTECTION FUND OF THE BAR OF MARYLAND; HONORABLE MARY ELLEN BARBERA, Chief Judge, in her official capacity; HONORABLE SALLY D. ADKINS, Judge, in her official capacity; HONORABLE CLAYTON GREENE, JR., Judge, in his official capacity; HONORABLE MICHELLE D. HOTTEN, in her official capacity as Judge of the Maryland Court of Appeals; HONORABLE ROBERT N. MCDONALD, Judge, in his official capacity; HONORABLE SHIRLEY WATTS, Judge, in her official capacity; BESSIE M. DECKER, in her official capacity as Clerk of the Court of Appeals; MARYLAND COURT OF APPEALS,

Defendants – Appellees.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, District Judge. (1:14-cv-01668-RDB)

Argued:  May 12, 2016          Decided:  September 13, 2016

---

Before KING and DIAZ, Circuit Judges, and DAVIS, Senior Circuit Judge.

---

Affirmed by published opinion.  Judge Diaz wrote the opinion, in which Judge King joined.  Senior Judge Davis wrote an opinion concurring in part and dissenting in part.

---

**ARGUED:** Scott Matthew Michelman, PUBLIC CITIZEN LITIGATION GROUP, Washington, D.C., for Appellant.  Michele J. McDonald, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.  **ON BRIEF:** Julie A. Murray, PUBLIC CITIZEN LITIGATION GROUP, Washington, D.C., for Appellant.  Brian E. Frosh, Attorney General, Alexis Rohde, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

---

DIAZ, Circuit Judge:

All attorneys licensed in Maryland who are not permanently retired must pay an annual fee to the Client Protection Fund of the Bar of Maryland. In addition to paying the fee, Maryland attorneys must also disclose their social security numbers to the Fund. Relying on federal law, the Court of Appeals of Maryland enacted this particular mandate in support of the state's efforts to collect back taxes and past-due child-support payments from attorneys.

The Court of Appeals suspended Michael Tankersley's law license after he refused to provide his social security number to the Fund. In response, Tankersley sued the trustees of the Fund and the judges and the clerk of the Court of Appeals (the "Defendants"), all in their official capacities, seeking injunctive relief based on his claim that his suspension violated the federal Privacy Act.

The district court granted the Defendants' motion to dismiss. Because we find that federal law gives Maryland the power (acting through its agents) to compel the disclosure of social security numbers in this circumstance, we affirm.

The Court of Appeals of Maryland has the statutory power to "establish a Client Protection Fund of the Bar of Maryland," in order "to maintain the integrity of the legal profession by paying money to reimburse losses caused by defalcations of lawyers." Md. Code Ann., Bus. Occ. & Prof. § 10-311. As part of this principal mission, the Fund is also required by statute to "provide a list of lawyers who have paid an annual fee to the Fund during the previous fiscal year to . . . the Comptroller, to assist the Comptroller in determining whether each lawyer on the list has paid all undisputed taxes." Id. § 10-313(a). That list must include "the federal tax identification number of the person or, if the person does not have a federal tax identification number, the Social Security number of the person." Id. § 10-313(b)(2)(ii).

In promulgating rules to enforce this statute, the Court of Appeals referenced the power given to the state by 42 U.S.C. § 405(c)(2)(C)(i). That provision was enacted as part of the Tax Reform Act of 1976, and it allows states to collect social security numbers for certain enumerated purposes, including the administration of tax laws.

The Court of Appeals also uses the Fund to comply with the Welfare Reform Act, 42 U.S.C. § 666, which Congress passed in

4

1996 to "increase the effectiveness of the [child support enforcement] program which the State administers." Id. § 666(a). To that end, the Welfare Reform Act conditions federal funding on states' having in effect "[p]rocedures requiring that the social security number of . . . any applicant for a professional license . . . be recorded on the application." Id. § 666(a)(13).

In 1997, the Maryland General Assembly passed a series of statutes to comply with the Welfare Reform Act, including Family Law section 10-119.3(b)(1), which compels each "licensing authority" to "(i) require each applicant for a license to disclose the Social Security number of the applicant; and (ii) record the applicant's Social Security number on the application." If Maryland's Child Support Enforcement Administration notifies the licensing authority that a licensee is in arrears on a child support order, it can "request a licensing authority to suspend or deny an individual's license." Md. Code Ann., Fam. Law § 10-119.3(e)(1). The Court of Appeals of Maryland is such a licensing authority. Id. § 10-119.3(a)(3)(ii)(15).

In 2009, then-Chief Judge Robert M. Bell of the Court of Appeals notified all Maryland attorneys that they were required to provide their social security numbers to comply with sections 10-119.3 and 10-313. Most Maryland attorneys heeded the Chief

5

Judge's notice, but over nine thousand did not. When the General Assembly threatened to withhold $1 million from the judiciary's budget if it did not move more aggressively against the recalcitrant attorneys, the Court of Appeals amended its rules to provide for enforcement.

The resulting Rule 16-811.5 mandated that "each attorney admitted to practice before the Court of Appeals . . . shall . . . provide to the treasurer of the Fund the attorney's Social Security number." Md. Rules, Rule 16-811.5(a)(1) (2014) (current version at Md. Rules, Rule 19-605(a)(1) (2016)).[1] In addition, Rule 16-811.6 provided that the Court could suspend the license of any attorney who fails to comply with Rule 16-811.5. Md. Rules, Rule 16-811.6 (current version at Md. Rules, Rule 19-606).

B.

Tankersley has been licensed to practice law in Maryland since 1986 and in the District of Columbia since 1987. He has practiced primarily in the District of Columbia, while living in either the District or Virginia. Outside of the suspension underlying this case, he has never been disciplined.

---

[1] The Court of Appeals has since reorganized the relevant rules. Though some parts of Rule 16-811.5 have changed, subsection (a)(1) is identical except for updated cross-references.

6

Tankersley was notified in February 2013 that the Fund had never received his social security number, as requested in 2009, and that he had until March 22, 2013 to provide it. Tankersley responded that he generally does not share his social security number unnecessarily because of concerns about identity theft. Tankersley also noted that Maryland state agencies have suffered cyberattacks, resulting in the exposure of individuals' private information.

Citing these concerns, Tankersley refused to provide his social security number to the Fund, and questioned the legality of Rule 16-811.5. He was thereafter notified that his license had been suspended because of his failure to comply with the Court's rule.

C.

Tankersley sued James Almand, the Chair of the Fund, the other trustees of the Fund, and the judges and clerk of the Court of Appeals, alleging that the suspension of his license to practice violated section 7(a)(1) of the Privacy Act. He sought injunctive relief.

Tankersley moved for summary judgment, and the Defendants moved to dismiss for failure to state a claim or for summary judgment. The district court, relying on its decision in

7

Greidinger v. Almand, 30 F. Supp. 3d 413 (D. Md. 2014),[2] granted the Defendants' motion to dismiss.

The court in Greidinger held that the word "applicant" in § 666 was not limited to "those who are applying or reapplying for a license," as "it is clear that under [the Welfare Act] the federal government intended to implement a system which required complete disclosure of [social security numbers] by every individual who is subject to a licensing authority," and § 666 therefore superseded section 7(a)(1). 30 F. Supp. 3d at 422, 424. The court also found that § 405 of the Tax Reform Act superseded section 7(a)(1) of the Privacy Act, noting that although "the statutory language is less than clear, the legislative history provides ample evidence that the Senate Finance Committee believed the needs of State and local governments trumped individual privacy in [the tax administration] context." Id. at 426.

Finding no basis for distinguishing the instant case from its holding in Greidinger, the district court dismissed Tankersley's complaint. This appeal followed.

---

[2] Like Tankersley, Greidinger is a licensed Maryland attorney who declined to provide his social security number to the Fund.

## II.

### A.

Congress passed the Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896, in light of the government's "increasing use of computers and sophisticated information technology," which "greatly magnified the harm to individual privacy that can occur from any collection, maintenance, use, or dissemination of personal information." Id. § 2(a)(2). To protect against such harms, section 7(a)(1) of the Act makes it "unlawful for any federal, state or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number." Important here, however, is section 7(a)(2), which makes section 7(a)(1) inapplicable to "any disclosure which is required by federal statute." Id. § 7(a)(2)(A).

Both the Tax Reform Act, 42 U.S.C. § 405(c)(2)(C)(i), and the Welfare Reform Act, 42 U.S.C. § 666(a)(13)(A), allow states to collect individuals' social security numbers in specific situations. This case turns on whether either provision applies to Maryland's annual collection of social security numbers from attorneys it has already licensed to practice. If so, Tankersley may not rely on the Privacy Act to shield his social security number from the Fund.

B.

We review de novo a district court's dismissal of an action under Fed. R. Civ. P. 12(b)(6). Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., 684 F.3d 462, 467 (4th Cir. 2012). "[W]e may affirm on any grounds supported by the record, notwithstanding the reasoning of the district court." Kerr v. Marshall Univ. Bd. of Governors, 824 F.3d 62, 75 n.13 (4th Cir. 2016).

We also review questions of statutory interpretation de novo. Broughman v. Carver, 624 F.3d 670, 674 (4th Cir. 2010). When interpreting a statute, our "objective . . . is 'to ascertain and implement the intent of Congress,' and Congress's intent 'can most easily be seen in the text of the Acts it promulgates.'" Aziz v. Alcolac, Inc., 658 F.3d 388, 392 (4th Cir. 2011) (quoting Broughman, 624 F.3d at 674-75). Where Congress has not defined a term, we are "bound to give the word its ordinary meaning unless the context suggests otherwise." Id. at 392-93.

C.

We first address whether, as the district court determined, the Welfare Reform Act requires Tankersley to provide his social security number to the Fund.

The Welfare Reform Act compels states to have "[p]rocedures requiring that the social security number of . . . any applicant

10

for a professional license . . . be recorded on the application." 42 U.S.C. § 666(a)(13) (emphasis added). We agree with Tankersley that "applicant" cannot properly be read to include a Maryland attorney who must pay an annual fee to maintain his license.

We are guided here by a fundamental principle of statutory interpretation, which directs that we "presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." Aziz, 658 F.3d at 392 (quoting Crespo v. Holder, 631 F.3d 130, 136 (4th Cir. 2011)). As Congress did not define "applicant," we give the word its ordinary meaning. Id. at 392-93.

An applicant is "someone who formally asks for something (such as a job or admission to a college)" or "someone who applies for something." Applicant, Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/applicant; see also Applicant, Webster's Dictionary (2d ed. 2001) (defining "applicant" as "a person who applies for or requests something; a candidate"). We think it plain that the ordinary meaning of the word does not reach someone like Tankersley who has already satisfied the requirements for a license to practice law in Maryland but must pay an annual fee to maintain that license.

11

As Tankersley points out, one would not say that a college sophomore who must pay the next semester's tuition before being allowed to continue his studies is an "applicant." See Appellant's Reply Br. at 5-6. So too here.

Moreover, the form the Fund uses to direct Maryland attorneys to provide their social security numbers underscores how poorly the word "applicant" fits in this context. It asks simply for the attorney's name, address, and social security number. See J.A. 30. Such a bare-bones form can in no way be described as an "application," and, indeed, even the Fund does not refer to the form as such. See J.A. 29-30 (referring to the document as the "attached form" and the "completed form").

Relying on Abramski v. United States, 134 S. Ct. 2259 (2014), the Defendants say that our understanding of "applicant" renders the provision absurd because it excludes the majority of Maryland attorneys, "alone among covered professions," from the Welfare Act's coverage. Appellees' Br. at 24. Not so. In Abramski, the Supreme Court chose between two readings of an ambiguous provision of the Gun Control Act of 1968. The Court rejected the reading that would have allowed a straw purchaser of a firearm to present himself as the actual buyer, because it "would undermine—indeed, for all important purposes, would virtually repeal—the gun law's core provisions," including "an

12

elaborate system to verify a would-be gun purchaser's identity and check on his background." 134 S. Ct. at 2267.

We do not face a similar consequence here. It is certainly true that our reading of § 666 is under-inclusive in that the Fund cannot compel disclosure of social security numbers from a subset of Maryland attorneys who were licensed before a certain date. But that is a far cry from saying that it works a "virtual repeal" of the statute's core provisions, given that the Fund's enforcement power nonetheless extends to a substantial portion of the Maryland Bar, and expands each year as new attorneys are admitted to practice. That the statute exempts some lawyers from the Fund's enforcement reach merely reflects the reality that "[n]o legislation pursues its purposes at all costs," Mohamad v. Palestinian Auth., 132 S. Ct. 1702, 1710 (2012) (quoting Rodriguez v. United States, 480 U.S. 522, 525-26 (1987)), and the final result "often involves tradeoffs, compromises, and imperfect solutions." Preseault v. ICC, 494 U.S. 1, 19 (1990).

We hold that the district court erred in relying on § 666 of the Welfare Reform Act to dismiss Tankersley's complaint. Accordingly, we turn to consider whether the Tax Reform Act provides the statutory hook necessary to support the district court's judgment.

13

D.

Section 405(c)(2)(C)(i) of the Tax Reform Act allows "any State (or political subdivision thereof)" to use social security numbers "in the administration of any tax . . . law within its jurisdiction, . . . and may require any individual who is or appears to be [affected by the tax law] to furnish to such State (or political subdivision thereof) or any agency thereof having administrative responsibility for the law involved, [his] social security account number."  See also Schwier v. Cox, 340 F.3d 1284, 1290 (11th Cir. 2003) ("The final version [of § 405(c)(2)(C)(i)] authorizes States to use [social security numbers] only 'in the administration of any tax, general public assistance, driver's license, or motor vehicle registration.'").

Recall that Tankersley's claim is premised on the view that the Fund violated his right under the Privacy Act not to disclose his social security number.  But as we noted earlier, the Privacy Act does not help Tankersley if the disclosure is required by federal law—in this case, say the Defendants, § 405(c)(2)(C)(i).

Tankersley resists this conclusion on three grounds. First, he says that Maryland's statutory requirement that the Fund furnish the Department of Assessments and Taxation and the Comptroller with a list of attorneys who paid the annual fee to the Fund does not amount to the use of social security numbers

14

"in the administration of any tax."  Second, he posits that the Fund is not an entity that has administrative responsibility for taxes, as contemplated by § 405.  Third, he argues that he is not an "individual who is or appears to be" affected by Maryland's tax laws because he neither works nor lives in Maryland, and he has never owed taxes there.

We address these contentions in turn.

1.

As was the case with the Welfare Reform Act, Congress did not define "administration" in § 405, thus we give it its ordinary meaning.  Aziz, 658 F.3d at 392-93.  The ordinary meaning of "administration" is the process of "manag[ing] the operation of" something, or putting something "into effect." Administering, Merriam-Webster Dictionary, www.merriam-webster.com/dictionary/administering; see also Administration, Merriam-Webster Dictionary, www.merriam-webster.com/dictionary /administration (defining "administration" as "the act or process of administering").

The breadth of the plain meaning of "administration" is consistent with Congress's treatment of the term as part of the broader legislation that enacted § 405.  See Tax Reform Act of 1976, Pub. L. No. 94-455 §§ 1202, 1211, 90 Stat. 1520 (codified as amended at 26 U.S.C. § 6103; 42 U.S.C. § 405).  There, in a provision of the Act expanding the Internal Revenue Code's

15

regulation of the disclosure of tax returns and tax return information, Congress defined "tax administration" as "the administration, management, conduct, direction, and supervision of the execution and application of" tax laws, including "assessment, collection, enforcement, litigation, publication, and statistical gathering functions under such laws."  26 U.S.C. § 6103(b)(4); see also id. § 6103(h)(1) ("Returns and return information shall . . . be open to inspection by or disclosure to officers and employees of the Department of the Treasury whose official duties require such inspection or disclosure for tax administration purposes.").

The Tax Reform Act of 1976 is comprehensive in scope.  In addition to making changes to the Internal Revenue Code, Congress also amended, for example, the Social Security Act, the Tariff Act of 1930, and the Commodity Exchange Act.  While the Act's definition of "tax administration" as applied to the Internal Revenue Code does not speak directly to the definition of "administration" in 42 U.S.C. § 405 (which was passed as part of the changes Congress made to the Social Security Act), it does inform our analysis. It not only shows that the same Congress that enacted § 405 understood "administration" to be an expansive term, but it does so in the context of a provision balancing individual privacy—there, of tax return information—

16

against the government's need to use private information to administer taxes, just as § 405 does.

Given this, we are satisfied that the ordinary meaning of the term "administration" in § 405 is sufficiently expansive so as to allow the state of Maryland to compel lawyers licensed in Maryland to disclose their social security numbers. The practice "assist[s] the Department [of Assessments and Taxation] in identifying new businesses within the State" and "assist[s] the Comptroller in determining whether each lawyer on the list has paid all undisputed taxes," Md. Code Ann., Bus. Occ. & Prof. § 10-313(a), which are functions of collection, enforcement, and statistical gathering required to enforce Maryland's tax laws.

2.

We are also not persuaded by Tankersley's contention that the Fund "is not an entity to which [social security number] disclosures may be required under § 405," Appellant's Br. at 26, in that it is not the "State (or political subdivision thereof) or [an] agency thereof having administrative responsibility for the law involved," 42 U.S.C. § 405(c)(2)(C)(i).

Tankersley would have us ignore that the "[s]tate [of Maryland] 'can act only through its officers and agents,'" and thus the act of collecting social security numbers is necessarily carried out by an officer or agent of the state. Nevada v. Hicks, 533 U.S. 353, 365 (2001) (quoting Tennessee v.

17

<u>Davis</u>, 100 U.S. 257, 263 (1879)).  Moreover, to allow only the state agency directly responsible for administering the tax laws to collect social security numbers would read the phrase "or political subdivision thereof" out of the statute, because it would not allow the state of Maryland, acting through other agents or political subdivisions, to collect the numbers.  <u>See, e.g.</u>, <u>TRW Inc. v. Andrews</u>, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" (quoting <u>Duncan v. Walker</u>, 533 U.S. 167, 174 (2001))).

We also think it clear that the Court of Appeals of Maryland (as a subdivision of the state) and the Fund are—at least for these purposes—agents of the state.  "A State acts by its legislative, its executive, or its <u>judicial</u> authorities.  It can act in no other way."  <u>Ex parte Commonwealth of Virginia</u>, 100 U.S. 339, 347 (1879) (emphasis added).  Maryland's constitution vests judicial authority in the Court of Appeals, Md. Const., Art. IV, §1, and the Court of Appeals has understood that power to include "the regulation of the practice of law, the admittance of new members to the bar, and the discipline of attorneys who fail to conform to the established standards governing their professional conduct," <u>Attorney Gen. v. Waldron</u>,

18

426 A.2d 929, 934 (Md. 1981). The Court of Appeals of Maryland is thus an agent of the state.

So too is the Fund, as an agent of the Court of Appeals. The Court, through the rulemaking authority given to it by statute, see Md. Code Ann., Bus. Occ. & Prof. § 10-311(a) ("The Court of Appeals may adopt rules that . . . provide for the operation of the Fund."), has delegated to the Fund the power "[t]o perform all . . . acts authorized by these Rules," Md. Rules, Rule 19-604(a)(15). Of course, the Rules authorize the Fund's collection of social security numbers. In this capacity, the Fund acts as an agent of the Court of Appeals, which is in turn an agent of the state. The Fund is therefore an entity under § 405 for purposes of requiring the disclosure of social security numbers.

3.

Tankersley's final salvo with respect to the reach of § 405 is that he is not a person who "is or appears to be" affected by Maryland's tax laws, because in the twenty-eight years that he has been licensed to practice law in Maryland, he has never lived in or owned property in Maryland, nor has he been required to pay taxes or make unemployment insurance contributions to the state.

We take Tankersley at his word when he says that he is someone who has not been affected by Maryland's tax laws. But

19

the statute reaches further to include individuals who "appear[]
to be" affected by tax laws.  Mindful of "our duty 'to give
effect, if possible, to every clause and word of a statute,'"
United States v. Menasche, 348 U.S. 528, 538-39 (1955) (quoting
Inhabitants of Montclair Twp. v. Ramsdell, 107 U.S. 147, 152
(1883)), a fair reading of § 405(c)(2)(C)(i) extends to all
attorneys licensed to practice law in Maryland.  Why?  Because
even though lawyers who live and practice elsewhere are less
likely to owe taxes to Maryland than those who live and work in
the state, Tankersley's ability to earn income in the state (by
virtue of his license) is enough to make him someone who
"appears to be" affected by Maryland tax laws for the purpose of
§ 405.  See Md. Code Ann., Tax-Gen. § 10-401 (providing for non-
resident allocation of income, losses, and adjustments for tax
purposes).

Accordingly, § 405 of the Tax Reform Act applies to
Tankersley, and the state of Maryland may lawfully compel him to
provide his social security number to the Fund on pain of
suspension of his law license.  The district court's judgment
dismissing Tankersley's complaint is therefore

AFFIRMED.

20

DAVIS, Senior Circuit Judge, concurring in part and dissenting in part:

Maryland Rules of Procedure 16-811.5 and 16-811.6, adopted in 2014, require that each attorney admitted to practice as a member of the Maryland bar disclose her social security number ("SSN") to the treasurer of the Client Protection Fund ("the Fund") or face suspension of her license to practice law. Michael Tankersley, an attorney who has long been admitted to practice in Maryland but has apparently never actually lived, worked, or practiced in the state, contends that, as applied to him, these Maryland Rules violate the federal Privacy Act of 1974. Section 7(a)(1) of the Privacy Act provides that "[i]t shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number." Pub. L. No. 93-579, § 7(a)(1), 88 Stat. 1896 (codified at 5 U.S.C. § 552a note).

Upon suspension of his law license for refusing to provide his SSN, Tankersley brought this suit against all Maryland Court of Appeals judges, the Clerk of Court, and the trustees of the Fund (together, "Appellees") in their official capacities. The district court granted Appellees' motion to dismiss based on its determination in a previous case that both the Welfare Reform

21

Act, 42 U.S.C. § 666, and the Tax Reform Act of 1976, 42 U.S.C. § 405, supersede the Privacy Act's guarantee that an individual may not be denied any legal right, benefit, or privilege for failing to disclose her SSN. My friends in the majority affirm on the ground that § 405, but not § 666, supersedes section 7(a)(1) of the Privacy Act as applied in this case.

While I agree with the majority that § 666 does not supersede the Privacy Act as it pertains to Tankersley, I respectfully dissent from its holding that § 405 does supersede the Privacy Act. I would also hold that Tankersley has a private right of action to enforce his Privacy Act rights under 42 U.S.C. § 1983. Thus, in my view, Tankersley's suspension from practicing law for refusing to disclose his SSN violated his Privacy Act rights. Accordingly, I would reverse the district court's judgment and remand with instructions to grant summary judgment for Tankersley.

I.

This Court reviews de novo a dismissal for failure to state a claim, Kenney v. Indep. Order of Foresters, 744 F.3d 901, 905 (4th Cir. 2014), and we likewise review de novo a denial of summary judgment, Nourison Rug Corp. v. Parvizian, 535 F.3d 295, 299 (4th Cir. 2008). Because I agree with the majority that § 666 does not supersede Tankersley's Privacy Act rights, as Tankersley is not an "applicant" for a professional license, I

22

begin by considering whether § 405 supersedes Tankersley's rights under the Privacy Act. Unlike the majority, I conclude that it does not.

II.

Under the Tax Reform Act,

> any State (or political subdivision thereof) may, in the administration of any tax, general public assistance, driver's license, or motor vehicle registration law within its jurisdiction, utilize the social security account numbers issued by the Commissioner of Social Security for the purpose of establishing the identification of individuals affected by such law, and may require any individual who is or appears to be so affected to furnish to such State (or political subdivision thereof) or any agency thereof having administrative responsibility for the law involved, the social security account number . . . issued to him by the Commissioner of Social Security.

42 U.S.C. § 405(c)(2)(C)(i). The Act also provides that, "[i]f and to the extent that any provision of Federal law heretofore enacted is inconsistent with the policy set forth in clause (i), such provision shall . . . be null, void, and of no effect." Id. § 405(c)(2)(C)(v). Appellees argue, and the majority agrees, that § 405 supersedes Section 7(a)(1) of the Privacy Act to the extent that it enables states to require individuals to furnish their SSNs in the administration of any tax law. See Appellees' Br. 26.

I would hold, however, that § 405 does not supersede the Privacy Act in this case for three reasons: First, the Fund's collection of SSNs is not an effort undertaken by the state "in

23

the administration of any tax" law.  See § 405(c)(2)(C)(i). Second, the Fund is not an entity to which the state may require individuals to furnish their SSNs, as it is not a direct agent of the state itself or a state "agency . . . having administrative responsibility for" any tax law. See id.  Third, Tankersley is not an "individual who is or appears to be . . . affected" by any Maryland tax law.  See id.  Thus, § 405 does not authorize the Maryland Court of Appeals to penalize Tankersley for refusing to disclose his SSN, and it does not supersede section 7(a)(1) of the Privacy Act as applied here.

## A.

The language of § 405 is fairly limiting.  The statute specifies (1) who may require the disclosure of SSNs (a "State (or political subdivision thereof)"); (2) for what purpose ("in the administration of any tax . . . law within [the State's] jurisdiction"); (3) to whom an individual may be required to make the disclosure ("to such State (or political subdivision thereof) or any agency thereof having administrative responsibility for the law involved"); and, finally, (4) who may be required to disclose her SSN ("any individual who is or appears to be . . . affected [by the State tax law]"). § 405(c)(2)(C)(i).  I begin by examining the first two requirements: whether the mandatory disclosure of SSNs at issue

24

in this case is an effort undertaken by the state of Maryland "in the administration of any tax" law. See id.

Maryland law requires that, each year, the Fund must "provide a list of lawyers who have paid an annual fee to the Fund during the previous fiscal year" to the State Department of Taxation "to assist the Department in identifying new businesses within the State" and to the Comptroller "to assist the Comptroller in determining whether each lawyer on the list has paid all undisputed taxes and unemployment insurance contributions." Md. Code Ann., Bus. Occ. & Prof. § 10-313(a). For each person listed, the Fund must provide "the federal tax identification number of the person or, if the person does not have a federal tax identification number, the Social Security number of the person." Id. § 10-313(b)(2)(ii). In an apparent effort to comply with this state law, the Maryland Court of Appeals adopted Maryland Rules of Procedure 16-811.5 and 16-811.6 and amended the rules of admission to the Maryland bar, see Md. Admis. R. 2(b), to require that applicants and members of the bar supply their SSNs to the Fund.

The Fund's stated purpose, however, is unrelated to the state's administration of any tax law: "The purpose of the Fund is to maintain the integrity of the legal profession by paying money to reimburse losses caused by defalcations of lawyers." Md. Code Ann., Bus. Occ. & Prof. § 10-311(b). It is therefore

25

dubious to conclude that Maryland has acted "in the administration of any tax" law by requiring the Fund, an entity that does not itself collect taxes and that exists for an entirely distinct purpose, to collect SSNs and supply them to the Comptroller for the Comptroller's use in monitoring compliance with tax laws.

Relatedly, the Maryland Rules at issue in this case are not the state laws requiring the Fund to provide SSNs to state tax authorities; instead, the Rules under review are Maryland Rules 16-811.5 and 16-811.6, which the Court of Appeals promulgated to require bar members to furnish their SSNs to the Fund. The suggestion that the state (through its Court of Appeals) acted "in the administration of any tax" law in promulgating Rules requiring that the Fund collect SSNs from bar members so that the Fund can comply with a separate Maryland law that requires it to provide SSNs to Maryland tax authorities so that those authorities may check compliance with tax laws is thus all the more attenuated.[1]  Accordingly, it does not appear that § 405 authorizes the Maryland Rules at issue.

---

[1] Tankersley characterizes the Fund's duty to pass along SSNs to state tax authorities as a "game of telephone across state agencies," Appellant's Br. 31, that is part of a "patchwork" scheme, id. at 32, involving a "hodgepodge of statutes through which SSNs wend their way from the [Fund] to state taxation authorities," Reply Br. 13.  While the statutory scheme might not quite warrant this colorful description, the (Continued)

B.

In any event, § 405 also specifies the type of entity to which a state may require individuals to supply their SSNs: a state may mandate SSN disclosure "to [a] State (or political subdivision thereof) or any agency thereof having administrative responsibility for the law involved." § 405(c)(2)(C)(i). Appellees argue that the Fund, in collecting SSNs under the Maryland Rules, is acting as an agent of the state, and since § 405 authorizes "the State" as well as state agencies responsible for administering tax laws to collect SSNs, the Maryland Rules comply with § 405. See Appellees' Br. 30-35. In other words, Appellees contend that two groups may collect SSNs under § 405—the state, including its direct agents, and state agencies with "administrative responsibility for the law involved"—and that the Fund belongs in the former group.[2] See id. at 32. The majority agrees.

The language of § 405 is not so expansive, however, as to allow us to consider the Fund a direct agent of the state of

scheme is certainly complex, and the Maryland Rules' connection to the state's administration of tax laws is tenuous at best.

[2] Notably, Appellees expressly concede that the Fund does not qualify for the latter group. That is, they do not suggest that the Fund is a state agency with administrative responsibility for any tax law. See Appellees' Br. 31 ("[F]or purposes of § 405, the Fund is not itself a state 'agency' that administers a tax, but rather an agent of the State housed in the judicial branch.").

27

Maryland. In interpreting a statute, we must "give effect to every provision and word in a statute and avoid any interpretation that may render statutory terms meaningless or superfluous." Discover Bank v. Vaden, 396 F.3d 366, 369 (4th Cir. 2005). If the phrase "the State (or political subdivision thereof)" were to include any state agency, such as the Fund, then the next phrase in § 405, authorizing SSN collection by "any [state] agency . . . having administrative responsibility for the law involved," would be superfluous. See § 405(c)(2)(C)(i).

Likewise, by expressly providing that "any [state] agency . . . having administrative responsibility for the law involved" may collect SSNs, Congress appears to have specifically excluded from § 405's purview state agencies, like the Fund, that are not responsible for administering tax laws. See id. If it intended otherwise, Congress could simply have established that a state may require SSN disclosure to "any state agency" and left it at that. See Reyes v. Gaona v. N.C. Growers Ass'n, 250 F.3d 861, 865 (4th Cir. 2001) ("[T]he doctrine of expressio un[ius] est exclusio alterius instructs that where a law expressly describes a particular situation to which it shall apply, what was omitted or excluded was intended to be omitted or excluded."); cf. Dep't of Homeland Sec. v. MacLean, 135 S. Ct. 913, 919 (2015) ("Thus, Congress's choice to say 'specifically prohibited by law' rather

28

than 'specifically prohibited by law, rule, or regulation' suggests that Congress meant to exclude rules and regulations.").

Appellees argue, on the other hand, and the majority agrees, that the statutory canon requiring that we attempt to "give effect to every provision and word in a statute," Discover Bank, 396 F.3d at 369, cuts the other direction. See Appellees' Br. 32–33. They contend that the phrase "State (or political subdivision thereof)" must include the state's direct agents for that term to have any meaning, as a state cannot act of its own accord. See id. at 32. Yet that proposition does nothing to demonstrate that the Fund in particular qualifies as a direct agent of the state. Although the Court of Appeals might meet this description, see Md. Const., Art. IV, § 1 (vesting Maryland's judicial power in the Court of Appeals), I see no reason to conclude that the Fund, a subset of the Maryland Court of Appeals, may serve as a proxy for the state itself.

That Congress, in enacting § 405, did not intend for a state agency to qualify as a stand-in for the "State (or political subdivision thereof)" is again exemplified by § 405's inclusion of a subsequent phrase specifically pertaining to state agencies—a statutory phrase that would more naturally describe the Fund, if only the Fund were a state agency with administrative responsibility for any Maryland tax law. See

29

§ 405(c)(2)(C)(i).  Accordingly, the majority's labored analysis, reasoning that the Maryland Court of Appeals is an agent of the state and the Fund is an agent of the Court of Appeals and thus the Fund is an agent of the state, forgets that the relevant question is whether the Fund is a <u>direct</u> agent of the state—the personification of the state itself—as opposed to a state agency organized and managed under the auspices of the state.  Because the Fund is neither a direct state agent nor an agency with administrative responsibility for any Maryland tax law, § 405 does not authorize the Maryland Rules at issue here, which require disclosure of SSNs to the Fund.

C.

Finally, even if § 405 does authorize the Fund's collection of SSNs in some circumstances, it does not allow Maryland to require the collection of Tankersley's SSN in particular, as Tankersley is not an "individual who is or appears to be" affected by any Maryland tax law.  <u>See</u> <u>id.</u>

Although Tankersley has been licensed to practice law in Maryland since 1986, he has been a resident of Virginia or Washington, D.C., and has worked in Washington, D.C., for the duration of that time, J.A. 114—indeed, he has also been licensed to practice law in Washington, D.C., since 1987, J.A. 10.  For the nearly three decades that Tankersley has been licensed in Maryland, he has not owned property in Maryland, and

30

he has not owed Maryland any taxes or unemployment insurance contributions. J.A. 114. Moreover, Tankersley has annually reported his home and work addresses to the Fund, which uses this information each year, along with information regarding Tankersley's bar memberships outside of Maryland, to determine whether he is subject to a mandatory assessment. See J.A. 114–15; Regs. of the Client Protection Fund of the Bar of Md. Currently Effective, § (i)(1)–(3), http://www.courts.state.md .us/cpf/pdfs/regulations.pdf (last visited Aug. 25, 2016).

Thus, not only does Tankersley not owe any taxes in Maryland (nor has he for nearly thirty years), but he also does not appear to owe any taxes in Maryland, as is clear from the information that Tankersley provides the Fund on a yearly basis. Someone who lives in Virginia and works in Washington, D.C., where he is licensed to practice law, does not "appear[] to be affected" by Maryland tax laws simply because he is also licensed to practice law in Maryland, particularly when he has not practiced law there and has no other apparent connection to the state.

Appellees contend that a more individualized approach to SSN collection would "require an unworkable, burdensome, administrative mechanism to determine whether there was some basis for taxing the specific individual." Appellees' Br. 29. Perhaps so. Yet, as mentioned above, the Fund already uses

31

individual bar members' information to determine whether each attorney owes a mandatory assessment, so the requisite mechanism already exists.  More to the point, § 405 is clear in specifying who may be required to disclose her SSN: "any individual who is or appears to be" affected by state tax law.  Appellees cannot eschew this language due to policy concerns about inefficiency.[3] Given that we must, to the extent possible, attempt to construe § 405 so as to preserve the Privacy Act, see Morton v. Mancari, 417 U.S. 535, 551 (1974) ("[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."), Appellees' argument concerning the relative ease and efficiency of a blanket mandatory collection of all licensed attorneys' SSNs is unpersuasive.

Lastly, it is ironic that, upon acknowledging that we must be "mindful of our duty to give effect, if possible, to every clause and word of a statute," ante at 20 (citations and

---

[3] Indeed, even if it were necessary to look beyond the statutory text, the relevant legislative history demonstrates that Congress intended for § 405 to be limited in scope.  When advocating the passage of § 405, the Senate Committee on Finance stated that it "believe[d] that State and local governments should have the authority to use social security numbers for identification purposes when they consider it necessary for administrative purposes."  S. Rep. No. 94-938, at 391 (1976) (emphasis added).  Maryland cannot in good faith consider a more efficient system strictly necessary, especially when the state's current administrative system is already capable of the task at hand.

internal quotation marks omitted), the majority ignores the precise wording of § 405—which authorizes the mandatory collection of an SSN only from an "individual who is or appears to be" affected by Maryland tax laws, § 405(c)(2)(C)(i)—and instead declares that "a fair reading of § 405(c)(2)(C)(i) extends to all attorneys licensed to practice in Maryland," ante at 20. Congress did not enact such an expansive statute, and we should not transform § 405 into one, particularly where we are obligated to give effect to every word in a statute and to interpret § 405 in a manner that preserves the federal Privacy Act (and the important protections it provides), to the extent possible.

Accordingly, I would hold that § 405 does not authorize the Fund to penalize Tankersley for failing to supply his SSN, as Tankersley is not an individual "who is or appears to be affected" by any Maryland tax law.

### III.

Having concluded that neither § 666 nor § 405 supersedes Tankersley's rights under section 7(a)(1) of the Privacy Act, the question remains whether Tankersley has a private right of action to enforce his rights. Tankersley argues that he may pursue his claim for declaratory and injunctive relief under 42 U.S.C. § 1983. See Appellant's Br. 36–43. I agree.

33

Section 1983 "imposes liability on anyone who, under color of state law or regulation, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" Blessing v. Freestone, 520 U.S. 329, 340 (1997). A plaintiff seeking redress under § 1983 "must assert the violation of a federal right, not merely a violation of federal law." Id. (citing Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 106 (1989)). We consider three factors when determining whether a particular statutory provision gives rise to a federal right. Id. "First, Congress must have intended that the provision in question benefit the plaintiff." Id. (citing Wright v. City of Roanoke Redevelopment & Hous. Auth., 479 U.S. 418, 430 (1987)). The Supreme Court has clarified that the federal right must be "unambiguously conferred"; it is insufficient that "the plaintiff falls within the general zone of interest that the statute is intended to protect." Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002). "Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not 'so vague and amorphous' that its enforcement would strain judicial competence." Blessing, 520 U.S. at 340–41 (quoting Wright, 479 U.S. at 431–32). "Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right

34

must be couched in mandatory, rather than precatory, terms." Id. at 341 (citing cases).

However, "[e]ven if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983. Because our inquiry focuses on congressional intent, dismissal is proper if Congress 'specifically foreclosed a remedy under § 1983.'" Id. (quoting Smith v. Robinson, 468 U.S. 992, 1005 n.9 (1984)). Congress may do so expressly or impliedly, such as by "creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." Id. (citing Livadas v. Bradshaw, 512 U.S. 107, 133 (1994)).

A.

While the question of whether section 7(a)(1) of the Privacy Act confers an individual right enforceable under § 1983 is an issue of first impression in this Circuit,[4] the Eleventh Circuit has answered this question in the affirmative. See Schwier v. Cox, 340 F.3d 1284, 1292 (11th Cir. 2003). The Ninth Circuit, the only other one of our sister circuits to resolve

---

[4] Because the district court below concluded that § 666 and § 405 supersede Section 7(a)(1) of the Privacy Act, it did not reach this issue. See J.A. 123–24. The district court in Greidinger v. Almand, which served as the basis for the district court's decision in this case, noted that this is "an open question in the Fourth Circuit," but it also declined to resolve the issue. 30 F. Supp. 3d 413, 426 (D. Md. 2014).

35

the issue,[5] agreed that section 7(a)(1) of the Privacy Act creates an individual right, but it held that Congress intentionally foreclosed § 1983 as a remedy. See Dittman v. California, 191 F.3d 1020, 1028–29 (9th Cir. 1999).

I would hold that, in enacting section 7(a)(1) of the Privacy Act, Congress created an individual right enforceable under § 1983. Section 7(a)(1) of the Privacy Act provides that "[i]t shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number." § 7(a)(1). Even though this provision proscribes the activity of a "Federal, State or local government agency," the statute is unambiguously focused on the right of an individual to retain her legal rights, benefits, and privileges when refusing to disclose her SSN. See Schwier, 340 F.3d at 1292 ("[T]he Privacy Act clearly confers a legal right on individuals: the right to refuse to disclose his or her ssn without suffering the loss 'of any right, benefit, or privilege provided by law.'"). Moreover, Congress explained that it enacted the Privacy Act "to provide

---

[5] This issue has come before the Tenth Circuit as well, but that court acknowledged the existing circuit split and dismissed the plaintiff's Privacy Act claims for other reasons. See Gonzalez v. Vill. of West Milwaukee, 671 F.3d 649, 662–63 (10th Cir. 2012).

36

certain safeguards for an individual against an invasion of personal privacy," Pub. L. No. 93-579, § 2(b), 88 Stat. 1896, expressing an intent to create and preserve individual rights.

Section 7(a)(1) of the Privacy Act differs in this way from the Family Educational Rights and Privacy Act of 1974 ("FERPA") at issue in Gonzaga University v. Doe. See 536 U.S. at 276. The Supreme Court in Gonzaga determined that FERPA, which provides that "[n]o funds shall be made available . . . to any educational agency . . . which has a policy or practice of permitting the release of education records . . . of students without the written consent of their parents," 20 U.S.C. § 1232g(b)(1), did not contain the requisite "rights-creating" language to allow for enforcement under § 1983. Gonzaga, 536 U.S. at 287. The Court explained that the statute's focus on funding for educational agencies "is two steps removed from the interests of individual students and parents and clearly does not confer the sort of 'individual entitlement' that is enforceable under § 1983." Id. Section 7(a)(1) of the Privacy Act, by contrast, establishes that individuals are entitled to decline to provide their SSNs while retaining their legal rights, benefits, and privileges. In doing so, section 7(a)(1) plainly confers an individual right and satisfies the first requirement for enforcement under § 1983. See Schwier, 340 F.3d at 1292; Dittman, 191 F.3d at 1028.

Further, the individual right created by section 7(a)(1) is not "'so vague and amorphous' that its enforcement would strain judicial competence." Blessing, 520 U.S. at 340-41 (quoting Wright, 479 U.S. at 431-32). An individual's right to retain "any right, benefit, or privilege provided by law" is clearly defined. See Dittman, 191 F.3d at 1028 ("[T]he statutory obligation imposed on governmental bodies is clear: A governmental body may not deny any individual any right, benefit, or privilege because she refuses to disclose her social security number, unless otherwise permitted by law."). Moreover, the Act unambiguously imposes a binding and mandatory obligation on the states by using the phrase "it shall be unlawful." See § 7(a)(1). Tankersley has thus established a rebuttable presumption of enforceability of his Privacy Act rights under § 1983.

B.

Appellees have failed to counter this presumption by demonstrating that Congress "specifically foreclosed a remedy under § 1983," see Blessing, 520 U.S. at 341 (quoting Smith, 468 U.S. at 1005 n.9), as their argument rests primarily on their

38

contention that the Privacy Act does not confer an individual right,[6] see Appellees' Br. 39–45.

As it happens, Congress has not foreclosed a remedy under § 1983. In concluding otherwise, the Ninth Circuit reasoned that, "[a]lthough the prohibitions of § 7(a)(1) apply to all governmental entities, including state and local governments, by limiting the scope of the Privacy Act's civil remedy provision, 5 U.S.C. § 552a(g), Congress clearly intended to 'foreclose private enforcement' against any entity other than federal agencies." Dittman, 191 F.3d at 1029. The civil remedy provision to which the Ninth Circuit referred, however, applies only to section 3 of the Privacy Act, which concerns the maintenance of individuals' records and which itself only regulates federal agencies. See 5 U.S.C. § 552a. The civil remedy provision does not apply to section 7, the section at issue in this case. See Schwier, 340 F.3d at 1289 ("Dittman

_____

[6] Appellees also assert that Tankersley cannot pursue his Privacy Act rights under § 1983 because "Congress lacked authority to abrogate the Eleventh Amendment immunity of the states in the Privacy Act." Appellees' Br. 38. The Supreme Court has consistently recognized, however, that "official-capacity actions for prospective relief are not treated as actions against the state." Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 n.10 (1989) (quoting Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985)). Accordingly, because Tankersley seeks injunctive relief, not damages, from state officials in their official capacity, this case does not implicate any Eleventh Amendment concerns. See id. ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 . . . .").

39

failed to recognize that the remedial scheme of section 3 applies only to section 3 and has no bearing on section 7."). Appellees acknowledge as much in their brief. See Appellees' Br. 38 ("The only private cause of action created under the Privacy Act exists under Section 3 of that Act, and is limited to claims against federal entities."). As the Privacy Act establishes "no enforcement scheme at all" with respect to the individual rights that section 7 confers, Congress has not foreclosed enforcement of these rights under § 1983.[7]  Schwier, 340 F.3d at 1292.

## IV.

Thus, neither 42 U.S.C. § 666 nor 42 U.S.C. § 405 supersedes section 7(a)(1) of the Privacy Act and authorizes the enforcement of Maryland Rules 16-811.5 and 16-811.6 against Tankersley.  Moreover, 42 U.S.C. § 1983 confers a private right of action for Tankersley to enforce his Privacy Act rights. Because this case involves no genuine issue of material fact, see Fed. R. Civ. P. 56, I would reverse and remand to the

---

[7] Tankersley argues in the alternative that a federal court may exercise its "inherent equitable power to enjoin violations of federal law."  Reply Br. 19.  Because I conclude that Tankersley has a private right of action to enforce his section 7(a)(1) Privacy Act rights under § 1983, I do not address this issue.

district court for entry of summary judgment[8] in favor of Tankersley.

---

[8] The parties have sufficient notice that we may grant summary judgment, as Tankersley filed a motion seeking this relief and Appellees styled their dispositive motion as a "Motion to Dismiss, or, in the Alternative, for Summary Judgment." See J.A. 116.